## WALTER WHEELER v. STATE.

No. A-9461. April 28, 1939.
(90 P. 2d 49.)

J. J. Smith and Jesse A. Harp, both of Miami, for plaintiff in error.

Mac Q. Williamson, Atty. Gen., Sam H. Lattimore, Asst. Atty. Gen., and William E. Poteet, Co. Atty., of Miami, for the State.

BAREFOOT, J. Defendant was charged in the district court of Ottawa county with the crime of "attempt to kill with a deadly weapon," and was convicted of "assault with a dangerous weapon," and his punishment assessed by the court at two and one-half years in the penitentiary, and he has appealed.

The record in this case contains much that is not necessary to a proper disposition of this appeal. We have carefully read the record, and it is unnecessary to go into detail in a discussion of the many immaterial matters, which lead up to the shooting in this case. The defendant was charged in the information with the crime of "attempt to kill with a deadly weapon." He was charged with shooting Arthur

Peck, who was night marshal at Commerce, Ottawa county, on the 30th day of August, 1936. A great amount of testimony was introduced, and time consumed, in showing the ill-feeling, and conduct of the prosecuting witness, Arthur Peck, toward the defendant and his family, prior to the actual shooting by defendant. This evidence was highly conflicting, but whatever may have been the attitude of this witness toward defendant and his family, was for the consideration of the jury. We will state from the reading of the record, there is strong evidence that the conduct of the prosecuting witness in arresting defendant at different times, and throwing him into jail, and without a charge being filed against him, was reprehensible. The evidence, to our mind, would not justify the belief that he was attempting to steal gasoline on the night he was arrested by the prosecuting witness, and placed in jail prior to the actual shooting. No doubt defendant had a right to feel unkindly toward the prosecuting witness, and this evidence was permitted to be introduced by the court, for the consideration of the jury, and especially with reference to the punishment which should be assessed by the court, or jury, against the defendant, in the event he was found guilty. It is not a question that can be passed upon by this court on appeal, after a verdict of guilty has been rendered by the jury, and judgment and sentence has been rendered by the trial court. The facts as above outlined showed that defendant had been arrested upon several occasions by Arthur Peck, the night marshal. Defendant's step-daughter, who was 15 years of age, testified defendant had made immoral proposals to her. That on the evening of August 30, 1936, at about 5:30 p. m., defendant and his little step-daughter, went in defendant's truck to a grocery store in the city of Commerce to get groceries. That on their way home they were traveling along the main street, and Arthur Peck was at one of the main intersections which defendant passed. The state's evidence revealed that defendant stopped his truck and motioned for witness to come to the

truck, and said to him: "You think you are a damned tough guy, don't you, Art?"

The prosecuting witness further testified:

"Q. What was said then? A. He said, 'Now, don't reach for your gun this time; it won't do you any good.' Q. What was done then? A. He leveled a pistol upon the door and shot me through this arm here. I had my arms holding down like this. Q. You were standing with your arms down? A. Yes. Q. About what length of time elapsed from the time he made the remark until he fired the gun? A. He just came right on up when he made the remark. Q. Did you reach your gun? A. I did. Q. How far did you get it? A. Just out of my scabbard. Q. How far did you get it? A. About like you have your hand. Q. Did you ever point your gun at the defendant? A. Never did. Q. Why? A. He shot it out of my hand. Q. Were you hit that time? A. Yes, my middle finger through my right hand. Q. What did you do with the gun at that time? A. Dropped it. Q. What did you do? A. Started leaving. Q. Which way did you start? A. Started north. Q. Was there another shot fired? A. Well I got about 5 or 6 feet, maybe 10 feet north of where I was standing when he shot me in the hand, and he fired the third shot— Q. Did that hit you? A. It did. Q. Where? A. Right back here. Q. Show the jury on my body, my back? A. About right there (indicating). Q. That was when you were going north leaving the scene? A. Yes. Q. What did you do then? A. I kept trying to get away; he shot two more times. Q. Which way did you travel after you were shot the third time? A. Still went on north,—northwest a little. Q. Did any one pick you up or catch you at that time? A. About the middle of the street; Fred Insworth and Charley Ward met me. I didn't fall. Q. Where were you then taken? A. Across the street, and a Mitchelson ambulance got me there. Q. Then where were you taken? A. To Miami Baptist Hospital. Q. Did you remain in the hospital some time? A. I did. Q. Did you ever fire a shot from your gun? A. I did not."

Numerous witnesses were offered by the state, who corroborated the evidence given by the prosecuting witness as to different occurrences at the time of the shooting, and especially with reference to the firing of the shots

by defendant, and as to the acts and conduct of the prosecuting witness.

The defendant's evidence was that he stopped his truck for the purpose of talking to Arthur Peck, about the trouble they had, but with no intention of having any trouble with him. His testimony with reference to how the shooting occurred was:

"Q. What did you say and what did he say? A. I says, 'Art I want to talk to you a little;' he says, 'All right.' I says, 'You have been hounding me around for just about a year and I want you to quit it,' and he started to reach for his gun. I said, 'No, don't reach for your gun; keep your hands away from it; I didn't stop here to have any trouble with you; I just wanted to talk to you for your good as well as mine; we both have families; I want you to let me alone from here on, unless I am doing something against the law.' He kinda squatted like he was going to reach for his gun; I said, 'Don't reach for your gun; I don't want to have any trouble with you; he jumped back to the side of the truck and grabbed his gun and says, 'I will just end you right now,' When he said that I reached for mine. Q. Where was it? A. Right in the side pocket of the truck. So when he pulled this gun or started to pull it, I reached and got mine and just as I reached around,— I had to look around the truck just a little——he had just got this gun and was coming up with it, getting it out of his holster, and I shot at him three times before he dropped it, and the third time I shot at him he dropped his gun and ran— Q. All right, where did he drop the gun with reference to the street? A. He dropped the gun just about even with the left rear wheel of the truck. Q. After the second shot he had a gun in his hand then? A. Yes. Q. Did he turn or spin any? A. Yes, sir, he did. The first two times I shot him I was trying to shoot him loose from that gun; I didn't want to have to kill him. I don't want to have to kill any one; and as I shot him in the arm he wheeled around—."

The 15-year-old step-daughter of defendant, who was with him at the time of the shooting, corroborated his testimony.

Many witnesses testified to the good character and reputation of defendant prior to the charges filed against him. A number of witnesses testified that the prosecuting witness, Arthur Peck, had a bad reputation as a trouble-making, trouble-inciting, and dangerous officer. Many others testified to his good reputation, and as to his being a good officer.

It will thus be seen that the evidence was highly conflicting. Much of it was incompetent, and was wholly foreign to the issue involved in the case. It is not important to a decision on appeal that it be further discussed. The jury passed upon it, found defendant guilty of assault with a dangerous weapon, and left his punishment to be assessed by the court, and the punishment was assessed at two and one-half years in the penitentiary.

The first error assigned is that the court erred in refusing to give requested instruction No. 1, which was presented by defendant, and was as follows:

"You are instructed that the defendant, Walter Wheeler, at the time in question, traveling upon one of the streets of Commerce, at a place where he had a right to be, and he had a right to stop, and to request the complaining witness for a chance to talk over their difficulties and misunderstandings and differences, and by so doing it gave said Peck no right to assault him, the said Wheeler; and neither did it give Wheeler any right to unwarrantedly assault Peck."

The defense of defendant was self-defense. The trial court, in instruction No. 8, gave to the jury a complete and correct statement of the law of self-defense. In this instruction the court used this language.

"Any person has a right to act in his own necessary self-defense, and where a person is in a place where he has a right to be, and is not the aggressor in bringing on the conflict, and is wrongfully and unlawfully attacked, he is not bound to retreat, but may stand his ground and repel the danger in which he is placed with such force as will protect him from the threatened danger, viewed from

his standpoint at the time; and it is not necessary to the right of self-defense that the danger should in fact exist. If, to the defendant, it appeared that the danger in fact existed, he had the right to defend against it to the same extent as if the danger had been real.

"The law of self-defense is a law of necessity; it is a defensive and not an offensive act; it does not imply the right of attack, and could not avail the defendant if he were the aggressor, or if the difficulty was sought for by him; or was provoked by him, by any willful act of his own, reasonably calculated to bring it about."

This instruction does not fail to give defendant's theory of the case as suggested by counsel. There is no doubt that defendant had the right to the use of the streets and highways, the same as did the prosecuting witness. The court's general instructions assumed this right as to both parties, and presented to the jury the question of self-defense, and while the requested instruction offered by defendant was true as an abstract proposition, in view of the general charge given by the court, there was no error in refusing to give the requested instruction offered by defendant.

Objection is further made to several instructions given by the court. We have carefully read the instructions and the objections and exceptions thereto. We do not find the court committed any error in the instructions given. The court presented to the jury the law where one shoots at another with intent to kill, or commits an assault and battery upon another by means of a deadly weapon, which was punishable by imprisonment in the penitentiary not to exceed 10 years. Oklahoma Statutes 1931, section 1873, Okla. Stat. Ann., title 21, sec. 652. The court then presented a charge based upon the statute. Oklahoma Statutes 1931, section 1870, Okla. Stat. Ann., title 21, sec. 645, which was an included offense. This statute provided that anyone who with intent to do bodily harm and without justifiable or excusable cause commits any assault upon the person of another with any sharp or dangerous weapon,

or who, without such cause shoots or attempts to shoot at another with any kind of firearm, with intent to injure any person, although without intent to kill such person or to commit a felony, is punishable by imprisonment in the county jail not exceeding 1 year. Under the law of this state, and the facts in this case, it was proper for the court to present both of these statutes to the jury. Ray v. State, 35 Okla. Cr. 322, 250 P. 438; DeWitt v. State, 58 Okla. Cr. 261, 52 P. 2d 88. The jury found the defendant guilty of the offense and left his punishment to the court.

In presenting the issues to the jury the trial court presented the law as to what constituted an overt act, the law with reference to proof of good character by defendant, of the bad reputation of the prosecuting witness, the law for the determination as to who was the aggressor, the law as to threats by the prosecuting witness toward the defendant, and the purpose of such evidence. In fact, the instructions given by the court were full and complete, and protected every right guaranteed to defendant under the law. We do not think the instructions, taken as a whole, seemed to indicate that defendant was the aggressor. It left this question for the jury to decide, and they decided it against the contention of defendant.

There is only one other question to be considered in this case. Did the court err in failing to sustain the motion for new trial? After the original motion was filed on June 21, 1937, an amended motion was filed on July 12, 1937. Attached to the amended motion were two unsworn statements filed by 9 of the jurors who served in this case. These statements were as follows:
"Hon. Ad V. Coppedge,

"District Judge,
"Miami, Oklahoma.

"Dear Sir:

"We, the undersigned jurors, sitting in the recent Walter Wheeler case, sincerely state that it is our opinion

that had it been expected that this man's punishment would be severe no verdict of guilty would have ever been returned.

"We believe he deserves some punishment and therefore recommend a light jail sentence. This, we sincerely believe will meet the ends of justice.

"It may be that had his conduct been different at the time of the trial no verdict of guilty would ever have been returned."

"Hon. Ad V. Coppedge,
    "District Judge,
        "Miami, Oklahoma.

"Dear Sir:

"We, the undersigned jurors in the recent Walter Wheeler case desire to state frankly that we believe this man would never been convicted had it been suspected that a severe sentence would have been imposed upon him.

"We believe that a light jail sentence would have been sufficient punishment and we recommend such a punishment. There were several of us who then believed and who now believe that 30 days would be ample punishment in the case."

Oral evidence was heard by the court in support of the motion. A statement of one of the jurors was admitted in evidence, in which he denied knowing the contents of the statement at the time he signed it, and that certain deception had been used by defendant in securing his signature to the same. After hearing the matter, the trial court overruled the motion for new trial, and defendant was sentenced to serve a term of two and one-half years in the penitentiary. This court has upon many occasions decided that the affidavit of jurors cannot be received for the purpose of explaining or impeaching their verdict. Petitti v. State, 2 Okla. Cr. 131, 100 P. 1122; Spencer v. State, 5 Okla. Cr. 7, 113 P. 224; Vanderburg v. State, 6 Okla. Cr. 485, 120 P. 301; Keith v. State, 7 Okla. Cr. 156, 123 P. 172; Overton v. State, 7 Okla. Cr. 203, 114 P. 1132, 123 P. 175; Owen v. State, 13 Okla. Cr. 195, 163 P. 548;

Brantley v. State, 15 Okla. Cr. 6, 175 P. 51; Revis v. State, 42 Okla. Cr. 198, 275 P. 351; Leasure v. State, 48 Okla. Cr. 307, 290 P. 931.

In the case at bar the jurors do not make affidavits, but simply sign a statement. This act on the part of the jurors cannot be too strongly condemned. They had an opportunity to assess the punishment under the law. They chose to give up this privilege and left the matter to the court. It is not only against public policy, but it would be opening the doors of the courts to the practice of fraud and perjury. Litigants against whom verdicts had been rendered would be continually importuning jurors, and attempting to obtain from them statements and affidavits upon which such verdicts could be assailed. There would be no end to litigation. It would destroy the very purpose of trial by jury, and especially is this true in the trial of criminal cases. In the case of Keith v. State, supra, Judge Furman, the first Presiding Judge of this court, gave an exhaustive opinion upon this question, citing the former decisions of this court, and citing many cases from other states, upholding this principle. It is unnecessary to again cite these decisions. In the opinion, it is said [7 Okla. Cr. 156, 123 P. 174]:

"It is true that hardships may arise under the rule forbidding the introduction of the testimony or affidavits of jurymen, for the purpose of impeaching their verdict; and, while it may be that justice may occasionally miscarry, unless such evidence be admitted, on the other hand, to receive such evidence opens wide the door to corrupt practices. The jury will be subjected to influences after they have been dismissed from duty as jurors, to induce them to repent of their verdict and endeavor to revoke it. They would be liable to be tampered with. It would be difficult to place a limit to the corruption such a practice might engender. In addition to all of this, there is another reason why jurors should not be allowed to impeach their verdicts by their voluntary affidavits or testimony. If this were permitted to be done, it would take from the court the power to grant a new trial and give it to the jury. Manifestly this would be inconsistent with the theory of our

judicial system, revolutionary in character, and contrary to public policy. In the absence of a statute in this state, directing the introduction of affidavits and testimony of jurors to impeach their verdict, we do not feel authorized to follow those courts which permit this to be done, when not directed by statute; and we feel that the safer and better plan is to adhere to our former decisions on this subject. * * *

"As was well said by Chief Justice Mansfield, if a verdict can be impeached by the affidavit or testimony of a juror, then in any criminal case tried in the state, no matter how conclusive the testimony and how regular the trial may have been in other respects, it will be in the power of one juror to secure a reversal of a conviction, and at the same time do it in such a manner as to conceal the purpose for which it was done, and thereby exempt himself from punishment."

The Territorial Supreme Court, in the case of Colcord v. Conger, 10 Okla. Cr. 458, 460, 62 P. 276, in a decision by Chief Justice Burford, quoting from Thompson on Trials, sec. 2618, says:

" 'Upon grounds of public policy, courts have almost universally agreed upon the rule that no affidavit, deposition, or other sworn statement of a juror will be received to impeach the verdict, to explain it, to show on what grounds it was rendered, or to show a mistake in it, or that they misunderstood the charge of the court, or that they otherwise mistook the law or the result of their finding, or that they agreed on their verdict by average or lot.' "

Chief Justice Burford then proceeded as follows:

"And this statement is amply sustained by a multitude of authorities. In fact, the only courts, it seems, which have made exceptions to this rule, are the courts of Kansas, Iowa, and Tennessee, and they limit the inquiry to matters which do not inhere in the verdict."

The Oklahoma Supreme Court has also followed the same doctrine. Baumle v. Verde, 50 Okla. 609, 150 P. 876; Glockner v. Jacobs, 40 Okla. 641, 140 P. 142; Tulsa Street Railway Co. v. Jacobson, 40 Okla. 118, 136 P. 410.

The contention that a witness was used by the state who had been in the courtroom during the trial, and that two witnesses were offered by the state who were upon the panel with the jurors who tried defendant, was overruled by the trial court. This was a matter that was within his judicial discretion, and in the absence of proof of abuse of this discretion, we do not find that any error was committed. There is nothing in the record to show defendant's act in drinking beer while the jury were deliberating on their verdict, except that on the hearing for the motion for new trial, defendant testified that his step-daughter told him someone had reported to the judge that "he was drinking, and that he was sore about it." There was clearly no error in the court's refusal to grant a new trial by reason of this. There is nothing in the record to show that this information was at any time conveyed to the jury.

We have carefully examined the record, and the able brief presented by counsel for defendant. We do not find that any fundamental error was committed in the trial of this case. From the facts it may be that defendant was mistreated by the prosecuting witness; that his arrest at times was unjustified, and he had a right to feel resentment of such treatment; but this did not give him the right under the law to arm himself, and carry a pistol in his car for weeks prior to the difficulty, and upon sight, upon the public streets, to stop him, and shoot at the prosecuting witness five times, one of the shots entering his back when he was fleeing from the scene of the difficulty. The defendant was charged with attempt to kill, which carried with it a maximum punishment of ten years in the penitentiary, and the court charged the jury upon an included statute of assault with a dangerous weapon. The jury found defendant guilty of the lesser offense, no doubt giving him the benefit of the doubt, and the benefit of his testimony that he had received unfair treatment from an officer, who at times felt his importance by reason of carrying a gun upon his hip, and in too quickly using the same. This same

jury had the opportunity under the law to give him further consideration and assess his punishment at a jail sentence, if they were of the opinion the facts justified. It ill becomes them, after the verdict was rendered, and judgment and sentence had been passed by the court, to say that it was not their intention that the defendant should receive such punishment. From the state's testimony the jury would have been warranted in finding defendant guilty of attempt to kill with a deadly weapon, which carried with it a maximum punishment of ten years in the penitentiary.

For the reasons above stated the judgment of the district court of Ottawa county is affirmed.

DOYLE, P. J., and DAVENPORT, J., concur.