**Dwight Andrew WALKER, Appellant,**

v.

**The STATE of Oklahoma, Appellee.**

**No. F–75–700.**

Court of Criminal Appeals of Oklahoma.

June 8, 1976.

Richard A. Hoffman, Public Defender, Tulsa County, for appellant.

Larry Derryberry, Atty. Gen., Robert L. McDonald, Asst. Atty. Gen., Doug Combs, Legal Intern, for appellee.

## OPINION

BUSSEY, Judge:

Appellant, Dwight Andrew Walker, hereinafter referred to as defendant, was charged, tried and convicted in the District Court, Tulsa County, Case No. CRF–74–1942, for the offense of Shooting with Intent to Kill, in violation of 21 O.S.1971, § 652. Jury trial being waived, the trial court fixed his punishment at twenty (20) years' imprisonment, and from said judgment and sentence an appeal has been perfected to this Court.

Briefly stated, at the trial the State's evidence in chief established that defendant shot Officer C. L. Lewis of the Tulsa Police Department shortly before 9:00 p. m. on August 19, 1974, at a residence located at 1962 North Cincinnati in Tulsa County. Officer Lewis and two other police officers with that department had responded to a dispatch to contact a woman in the yard at that address with reference to a mental patient armed with a gun. As the officers approached two small children and defendant's mother in the front yard, defendant fired upon the officers with a pistol from the front porch and retreated into the house when officers returned gunfire. When Officer Lewis ran across the front yard to gain protective cover behind a tree, defendant shot him with a shotgun from a window of the residence. The shotgun blast was fired at a distance of about twelve to thirteen feet and struck the officer along the left side of the body, knocking him to the ground. Several pellets entered his body, including about five pellets in the side of the body, one pellet in each arm, one pellet in the left side of the neck and one pellet in the left leg. One pellet pierced the commission case carried in his left shirt pocket and another lodged in his handcuff case. Officer Lewis was, however, able to crawl behind the tree to where another officer had sought protection. Approximately fifteen to twenty police officers were soon upon the scene and continued to exchange gunfire with defendant for about an hour. During this period defendant barricaded himself within the house with furniture, and fired upon officers from behind a fireplace in the living room, where with relative protection he could shoot through either of two windows located at the front of the house. Several shots fired by defendant struck the tree behind which Officer Lewis had sought protection, as well as a car in the driveway to the residence behind which other officers had acquired protection. Officers placed roadblocks nearby to protect others from being injured, and shot out street lights around the residence to protect themselves from being silhouetted against the lighting. Electricity to the house was terminated and spotlights were trained upon the front windows but were of little assistance. An attempt was made to contact defendant and negotiate with

him by telephone but the telephone receiver within the residence was apparently not in place. A bullhorn was repeatedly used in an attempt to persuade defendant to surrender himself, but defendant shouted obscenities and continued to fire upon the officers. Defendant's mother and the two children were rescued from the area in front of the residence by driving a police car between themselves and the house and having them crawl into the back seat of the vehicle. A heavy barrage of gunfire was employed in removing Officer Lewis to safety, and he was then taken to a hospital by ambulance. Teargas canisters were fired at a front window of the house, but several bounced off a chair used to partially barricade the window before officers were successful. The teargas then soon caused defendant to leave the house and walk out to the front porch. One of the officers then exposed himself from protective cover, and Officer Claude M. Graves shot defendant with a ten gauge shotgun from a distance of about twenty to twenty-five feet when defendant suddenly dropped his arms and began to turn, contrary to directions from the officers. A .22 caliber automatic pistol, or Luger, with one live shell in the firing chamber and eight rounds in the clip had not previously been observed upon the front porch but was discovered there after defendant toppled from the porch. Defendant was handcuffed and advised of his rights, and when then asked what he was trying to do, he replied, "I'm just mixed up." [Tr. 75] Defendant then kicked at officers as he was placed in an ambulance and removed to a hospital where he was reported to be in serious condition but refusing treatment. A twelve gauge shotgun with one live shell in the firing chamber and a fully loaded .22 caliber revolver were discovered in the living room of the house, along with numerous spent shotgun shells and .22 caliber cartridges and boxes of live ammunition.

Pauline Geneva Erby first testified for the defense that at the request of her sister, defendant's mother, she telephoned the police on August 19, 1974, and reported that she had a mentally ill nephew who had armed himself with a shotgun and pistol and stationed himself at a window.

Ozetta Minnie Walker, defendant's mother, then testified that she saw her son with a shotgun and pistol on August 19, 1974, and when she inquired about the guns defendant related that he was going to shoot squirrels. She also confirmed generally the previous testimony of witnesses testifying for the State. Her son was committed to Eastern State Hospital at Vinita for about four months in 1969 when he was seventeen years old. When released he was placed upon medication and treated as an out-patient at the Tulsa Psychiatric Center. At the time of the subject incident, defendant was not taking the medication.

Defendant next testified as the final witness in his behalf. He reiterated that he had been committed for mental treatment at Eastern State Hospital for a period of about three and one-half months when he was seventeen years of age in 1969. After being released he was treated as an out-patient at the Tulsa Psychiatric Center in 1969 and 1970. Two drugs had been prescribed for him, Thorozine and Phrenquil, and he continued to take the medication until he exhausted his supply about one month prior to August 19, 1974. [Tr. 115] With respect to the events of that evening, defendant acknowledged that he owned the guns recovered by police officers, and when asked what precipitated the shooting incident, he testified:

"Well, I was standing on the porch and I saw these two officers walk up in the yard. And I saw one snap his holster like he was about to draw his pistol, and it startled me. And I fired on him and then I ran in the house to prevent the shot from coming in my mother's direction. I fired two warning shots out of the window with a shotgun." [Tr. 117]

Defendant then testified that he engaged in a gun battle with police officers for

about forty-five minutes to an hour, and acknowledged shooting at the car in the driveway and the tree behind which officers had concealed themselves. He was not aware that he had shot a police officer, and further testified that he "was not shooting to kill" and "was basically trying to make noise." [Tr. 124 and 126] He also acknowledged hearing the officers announce on a bullhorn that he would not be harmed if he would come out with his hands up, but explained that he did not then leave the house because he was fearful of being shot. He denied shouting profanity in response to the officers, and testified that he replied that he would come out in the morning. When he did leave the residence, defendant denied taking a pistol to the front porch and testified that he did not intentionally drop his hands but only stumbled. As a result of being shot in the left side with a shotgun, he was hospitalized for approximately one and one-half days. However, his treatment was principally limited to cleaning the wound, and he declined operative treatment because he "didn't feel like it was necessary getting cut open for the small pellets." [Tr. 121] He was then taken to Eastern State Hospital for treatment in October, 1974, where Prolozin was prescribed as an intravenous medication. [Tr. 119] However, when he was returned to jail the following February, he did not continue to use the medication because there was no one available to administer the drug.

Insofar as pertinent, the State presented testimony in rebuttal that while en route to the hospital in an ambulance defendant remarked, "I got one of you mother _____'s." When asked why he was shooting, defendant replied, "You're all dumb," and further stated, "You couldn't get me away because I had the furniture in front of the windows and the doors." [Tr. 134]

In the first of his two assignments of error, appellate counsel contends that defendant was deprived of the effective assistance of trial counsel since the public de-fender then representing defendant did not endeavor to present evidence that defendant was insane when the offense was committed. The trial court records revealed that defendant was committed for mental observation to Eastern State Hospital on September 5, 1974. On September 24, 1974, that institution notified the trial court that defendant was then mentally ill according to the laws of this State, and not presently capable of advising an attorney in his defense. The trial court then committed defendant to the same institution for mental treatment on October 2, 1974. The institution subsequently advised the trial court on February 11, 1975, that defendant was presently sane according to the laws of this State, and able to distinguish between right and wrong and capable of advising counsel in his defense. However, recommendation was made that defendant's medication be maintained after being discharged from the institution. Further, trial counsel presented medical records to the trial court prior to judgment and sentencing indicating that defendant gave inappropriate responses when hospitalized for treatment of his shotgun wound, and when committed to Eastern State Hospital was diagnosed as Schizophrenia, paranoid type. Nevertheless, the transcript of proceedings before the trial court indicate that defense counsel was fully cognizant that insanity was a potential defense to be considered, and with available proof simply made a judgment decision that such a defense should be abandoned in favor of introducing evidence upon defendant's state of mind as a mitigating circumstance rather than a complete defense to the crime. This conclusion is fortified by the Affidavit of defendant's trial counsel which was filed herein and is attached as an Appendix.

 We have repeatedly held that relief upon the ground of ineffective counsel will be granted only when the trial is a farce or mockery of justice, or is shocking to the conscience of the reviewing court, or the purported representation was only perfunctory, in bad faith, a sham, a pre-

tense, or without adequate opportunity for conference and preparation. Further, the burden is clearly upon the defendant to establish inadequate representation, and this burden is not sustained by simply pointing out possible errors in counsel's judgment or lack of success in defense. See, *Jones v. State,* Okl.Cr., 513 P.2d 1402 (1973). Clearly, trial counsel was not here successful in convincing the trial court, sitting as trier of fact, that defendant's state of mind was a mitigating circumstance. However, we agree with the argument of the State that hindsight always presents a better viewpoint than foresight and is not the proper measure for determining adequacy of legal representation. See, *Ellis v. State,* 430 F. 2d 1352 (10th Cir. 1970), cert. den., 401 U. S. 1010, 91 S.Ct. 1260, 28 L.Ed.2d 546. In this regard, we approve the following discussion from *Williams v. Beto,* 354 F.2d 698, 706 (5th Cir. 1965):

> "[T]he fact that some other lawyer followed a different course in another case, or would have done differently had he been acting as counsel, is no ground for branding the appointed attorney with the opprobrium of ineffectiveness, or infidelity, or incompetency. The practice of law is an art as well as a science. As no two men can be exactly alike in the practice of the profession, it is basically unreasonable to judge an attorney by what another would have done, or says he would have done, in the better light of hindsight. . . . ."

Applying the foregoing rationale to the present case, we are of the opinion that this proposition is without merit.

■ In the final assignment of error defendant contends that the sentence imposed is excessive. We have consistently held that the question of excessiveness of punishment must be determined by a study of all the facts and circumstances in each particular case, and this Court does not have the power to modify a sentence unless we can conscientiously say that under all the facts and circumstances the sentence is so excessive as to shock the conscience of this Court. See, *LaRue v. State,* Okl.Cr., 404 P.2d 73 (1965). Although the trial court imposed the maximum sentence authorized by law, under the facts and circumstances presented we do not find that sentence to be so excessive as to shock the conscience of this Court.

For the above and foregoing reasons, the judgment and sentence appealed from is, accordingly, AFFIRMED.

BRETT, P. J., and BLISS, J., concur.

## APPENDIX

### AFFIDAVIT

"In February 1975 I was appointed to represent Dwight Andrew Walker in case number ·CRF–74–842 [sic], Shooting with Intent to Kill. On March 4, 1975 a preliminary hearing was had and following the conclusion of testimony the Defendant was bound over to the District Court for arraignment. The arraignment was had March 13, 1975 and the case was set on the April jury trial docket. The case was set for trial April 7. Prior to April 7, 1975 I had with Mr. Walker at least three conversations in which trial strategy was discussed. I informed him on at least one of these occasions that because the victim in this case was a police officer and that in all likelihood we would be facing an all-white jury (Mr. Walker is black.), it was my opinion that the case should be tried to the Court rather than a jury. With Mr. Walker's agreement, right to trial by jury was waived April 7. The case was set for non-jury trial April 28.

"From April 7 to April 28 several conversations between Mr. Walker and myself took place, all in the County jail. On at least four occasions I spoke with his mother in the Office of the Public Defender. In addition, I spoke by telephone with Dr. Joe Tyler, then Acting Superintendent of Eastern State Hospital at Vinita. Dr. Tyler and I discussed Mr. Walker's prognosis, his treatment while at Eastern State,

and the medication prescribed for Mr. Walker. From each of these conversations and consultations, I drew the conclusion and formed the opinion that a defense of not guilty by reason of insanity was neither viable or valid within the confines of the existing law in Oklahoma for insanity. I believed that Mr. Walker did, in fact, know right from wrong at the time of the commission of his acts and was aware of the consequences of his acts. Various statements made by Mr. Walker while in the commission of the acts complained of as well as the actions taken by him to preserve his own safety led me to believe—and I still believe—that he was not insane at the time of his acts within the confines of the M'Naghten Rule. Upon reaching this conclusion I determined that the defense should seek to mitigate punishment rather than present an affirmative defense. Discussions with members of the District Attorney's Office pursuant to plea negotiations led me to believe that the State would recommend to the Court, upon a plea of guilty, a sentence in the area of five to ten years, although no definite figure was reached until the day of non-jury trial, April 28, 1975. On that day Assistant District Attorney Les Williams told me the state would recommend nine years' incarceration upon a plea of guilty. After discussing the matter with Dwight Walker and with his agreemnt as well as that of his mother, the offer was rejected and we proceeded to trial. It was my goal to convince the Trial Court that because of Mr. Walker's lengthy psychiatric history he should be given every consideration in sentencing. Mr. Walker was found guilty of Shooting with Intent to Kill on April 29 and formal sentencing was set for May 20, 1975. In the interim I sought to supply to the Court documentary evidence of Dwight Walker's emotional problems in the hope that the Trial Court would take note and apply leniency in sentencing. Also during the interim from finding of guilty to sentencing a well-publicized incident occurred wherein a police officer was brutally shot and paralyzed. The publicity attendant to the Sergeant Stortz shooting was so great that, in my opinion, it had no less than a tangential effect on Mr. Walker's sentence. Whether Dwight Walker's severe sentence was, in fact, partially the result of the Stortz shooting, I will never know. However, it is obvious from the sentence that my efforts to mitigate punishment failed. In retrospect, any errors in judgment made by me were made pursuant to a good-faith effort to represent Mr. Walker to the best of my ability. The decision to forego asserting insanity as a defense was made knowingly and willingly by me but only after discussing the matter thoroughly with Mr. Walker."