Robert KELLER, Appellant,

v.

The STATE of Oklahoma, Appellee.

No. F–80–466.

Court of Criminal Appeals of Oklahoma.

Oct. 7, 1982.

David C. Hood, John L. Paulhamus, Oklahoma City, for appellant.

Jan Eric Cartwright, Atty. Gen., Michael Scott Fern, Asst. Atty. Gen., Oklahoma City, for appellee.

OPINION

CORNISH, Judge:

The appellant, Robert Keller, was convicted in Oklahoma County District Court of Murder in the First Degree and sentenced to life imprisonment.

I

The critical issue on appeal is whether there was sufficient independent evidence to corroborate the testimony of accomplice, Mel Ferguson. A detailed recitation of the testimony is necessary to dispose of this proposition.

Ferguson, the State's key witness, testified that in March, 1979, the appellant, asked him to arrange the death of Robert Busch. Ferguson related that at the time he was an employee at Kelco Oil Company, which was owned and operated by the appellant. He stated that Keller threatened to harm his wife and children if he failed to have Busch killed. Ferguson allegedly contacted Jim Pompa, who indicated he would arrange to have Busch killed. Pompa then allegedly hired Steven and Michelle Binsz and Carla Rapp to accomplish the killing. On March 18, 1979, Mr. Busch was shot and killed at his Oklahoma City home. Steven and Michelle Binsz were later tried and convicted for the murder.

Carla Rapp, also an accomplice, testified at Keller's trial about her participation in the Busch killing. She stated that in return for killing Busch she was promised six hundred dollars, a job at an oil company, and the use of a Lincoln Continental. Ms. Rapp told the jury that on March 18, 1979, she and Steven and Michelle Binsz drove to Busch's home in Oklahoma City. Ms. Rapp and Michelle Binsz knocked on the door, then rushed in and grabbed Busch when he opened it. After a struggle, Steven Binsz shot Busch with a high powered rifle. Ms. Rapp also testified that she knew Jim Pompa and Mel Ferguson, but that she did not know Robert Keller.

The State called several other witnesses to establish the shooting death of Robert

Busch, but relies primarily upon the testimony of three witnesses to corroborate the testimony of accomplice, Mr. Ferguson. First, Robin Brewton an attorney in Oklahoma, testified about his business relationships with Robert Keller. He further testified about Keller's disagreements with Busch and Keller's vow that "Mr. Busch was a dead man and didn't know it." Brewton stated that from the context in which these words were spoken he concluded that Keller was going to kill Busch.

Prior to working for Keller, Brewton was a professor of criminal justice, an agent with the United States Treasury Department, Alcohol, Tobacco and Firearms Division, and a special agent with the Inspector General's Office of the United States Agriculture Department. Brewton stated that he was introduced to Keller by the victim, Busch. Brewton initially performed legal services for Keller, then later worked for Kelco Oil Company on a part-time basis as assistant manager. Brewton also represented Mr. Keller and Kelco Oil Co. when Busch sued Kelco Oil over an employment contract dispute. Brewton testified that during the employment dispute, in which Busch was suing for two thousand dollars in damages, Keller constantly spoke about eliminating Busch. Keller asked Brewton's advise as to whether he should bring in a Mr. Burke to handle the Busch matter. Brewton testified that Burke used to work for Keller and that Burke was a "hit man out of Chicago."

During cross-examination Brewton stated that when he heard about Busch's homicide he and his law partner, Carl Walsingham, left for Fort Worth, Texas to discuss the matter. Brewton stated that he went to Texas because he feared for his life. A week later, Brewton related his information concerning the Busch homicide to Detective Gallegly of the Oklahoma City Police Department. Brewton further explained that Keller originally hired Busch as a bodyguard because of employment problems he was having with Burke. At the time of trial, Brewton had given up his law practice and moved out of Oklahoma in fear that Keller would harm him.

The State also called Michael Kerran, vice-president of Double Eagle Lubricants Company. Double Eagle sold oil products to Keller's oil company. Kerran testified that he had been involved in a dispute with Keller and Busch. In the summer of 1978, Keller accused Kerran and Busch of conspiring to steal oil products from Kelco. Approximately $15,000.00 worth of oil had been stolen from the Kelco warehouse. Keller told Kerran that "he knew people in California and Nevada that could kill people, and that's something that Mr. Busch—a person like Mr. Busch deserved." Kerran further stated that when he and Keller discussed the oil theft, Keller pulled out a gun and pointed it at him when he attempted to leave Keller's office. After this incident, Kerran curtailed all business relationships with Keller.

However, on March 19, 1979, the day of the Busch homicide, Keller called Kerran and asked if he could meet with him. Kerran stated he was too busy and asked Keller if he could meet with him the following day. Later that day, Keller again called Kerran and asked him if he would stop by his house on the way home from work. Kerran agreed. At the meeting Keller apologized for the misunderstanding about the stolen oil and told Kerran he wanted to resume business relations. Kerran related that during the meeting Keller reiterated that he "knew people in Nevada and Oklahoma that could get people killed, and that's something a person like Mr. Busch deserved." Kerran concluded his testimony by stating he remembered the date of the meeting because he heard about Busch's homicide that night on the ten o'clock news.

The defense called Carl Walsingham, during its case in chief. Walsingham testified he was Robin Brewton's law partner and represented Kelco Oil in several legal matters. He stated that Keller was an impetuous person, hot tempered, and a person who wanted progress faster than the normal procedure. Walsingham was hired to work full time for Kelco after the Busch homicide. He testified that Brewton thought

Keller had a contract out on his life even before the Busch homicide. Walsingham stated he was also concerned about Keller. He testified that "if he [Keller] wanted to kill me, I wasn't running. I figured the closer I was to him the more I would know about it. . . . I figured I'd be safer around him than I would not knowing where he is and what he is doing."

On cross-examination Walsingham related that he thought Keller overreacted to the law suit brought by Busch. He stated that he had heard Keller make some statements about "getting rid" of Busch. He further stated that Brewton was present when Keller made these statements.

■ Title 22 O.S. 1981, § 742, provides that "[a] conviction cannot be had upon the testimony of an accomplice unless he be corroborated by such other evidence as tends to connect the defendant with the commission of the offense, and corroboration is not sufficient if it merely shows the commission of the offense or the circumstances thereof." Cases interpreting this statute hold that corroborative evidence "must of itself, and without the aid of the testimony of the accomplice, tend in some degree to connect a defendant to the commission of the offense charged." *Frye v. State,* 606 P.2d 599, 606 (Okl.Cr.1980). Evidence which falls short of proving the accused's guilt can be sufficient, if it tends to connect the defendant to the crime and not simply with its perpetrators. *Howard v. State,* 561 P.2d 125, 132 (Okl.Cr.1977). Further, "if an accomplice's testimony is . . . corroborated as to a material fact, the jury may infer that he speaks the truth as to all, and this Court will take the strongest view of the corroborating testimony that it warrants." *Frye v. State,* supra.

■ We find that the testimony of Robin Brewton, Michael Kerran, and Carl Walsingham sufficiently connects Keller to the crime independent of Mel Ferguson's testimony. Each of these witnesses testified as to statements made by the appellant which directly linked Keller to the shooting death of Busch. See *Tabor v. State,* 582 P.2d 1323 (Okl.Cr.1978).

## II

The appellant next contends the trial court erred in admitting Brewton's testimony in violation of the attorney-client privilege. Keller argues that all statements made to Brewton were confidential and privileged communications. After an in-camera hearing, the trial court ruled that the communications were not privileged under Title 12 O.S. 1981, § 2502(D)(1). This section provides that there is no privilege "[i]f the services of the attorney were sought or obtained to enable or aid anyone to commit or plan to commit what *the client* knew or reasonably should have known to be a crime or fraud."

The appellant asserts that the trial judge's ruling was in error because the attorneys, Brewton and Walsingham, were not sure Keller was serious in requesting their advice about "getting rid of" Busch. We disagree. Section 2502(D)(1) is a codification of prior Oklahoma case law. In *Cole v. State,* 50 Okl.Cr. 399, 298 P. 892 (1931) this court stated:

> . . . [T]hat in order that a communication between a lawyer and his client may be privileged, it must be for a lawful purpose, or in furtherance of a lawful end. Accordingly, communications made to counsel prior to the commission of a crime which is contemplated by the so-called client, and in reference to the perpetration thereof, or for the purpose of being guided or assisted therein, are in no sense privileged and the attorney may testify thereto.

■ The State made a prima facie showing that because the attorney-client relationship was intended to further a criminal act, the communications between attorney Brewton and Keller had lost their confidential character. Sufficient evidence supports the trial judge's ruling that the attorney-client privilege did not exist in regard to the statements made by Keller to his attorney about killing Busch.

## III

■ On December 14, 1979, one day after the jury had rendered its verdict of guilty,

Juror Alice Graham contacted defense attorney, Joel Carson, and stated that she felt that the State had not proven Keller's guilt beyond a reasonable doubt. She later testified under oath, "I was so tired, I just gave up and voted what the—with the rest of the jurors and I knew it wasn't right." The appellant argues Juror Graham's testimony establishes that the verdict was affected by an outside influence on the jurors, resulting in a verdict which was not unanimous.

The State contends that a juror should not be able to impeach the jury's verdict through a post-trial affidavit. We have consistently held that public policy dictates that jurors will not be permitted to impeach their verdict after they have been discharged and have mingled with the public. *Daniels v. State,* 554 P.2d 88 (Okl.Cr.1976); See also *West v. State,* 617 P.2d 1362 (Okl. Cr.1980); *Cortez v. State,* 415 P.2d 196 (Okl. Cr.1966); *Craddock v. State,* 13 Okl.Cr. 724, 167 P. 331 (1917).

In *Wheeler v. State,* 66 Okl.Cr. 127, 90 P.2d 49 (1939), this Court articulated the basic policy considerations in disallowing jurors the ability to impeach their verdicts. The *Wheeler* Court asserted:

> It is not only against public policy, but it would be opening the doors of the courts to the practice of fraud and perjury. Litigants against whom verdicts had been rendered would be continually importuning jurors, and attempting to obtain from them statements and affidavits upon which such verdicts could be assailed. There would be no end to litigation. It would destroy the very purpose of trial by jury, and especially is this true in the trial of criminal cases.
>
> ... The jury will be subjected to influences after they have been dismissed from duty as jurors, to induce them to repent of their verdict and endeavor to revoke it. They would be liable to be tampered with. It would be difficult to place a limit to the corruption such a practice might engender.

Further, Title 12 O.S. 1981, § 2606(B), codifies this principle. Therefore, we find the appellant's argument to lack merit.

## IV

█ The appellant also argues that he did not make a knowing and intelligent waiver of his right to a preliminary hearing as guaranteed by the Oklahoma Constitution Art. 2, § 17. The record contains an affidavit signed by Keller waiving his right to a preliminary hearing. This affidavit recites that Keller "is aware of his right to a preliminary hearing under the provisions of Article 2, Section 17 of the Oklahoma Constitution."

The appellant failed to raise this issue at any time prior to, or during trial. Furthermore, this issue was never raised in the motion for new trial or in the petition in error. We conclude it has not been properly preserved for appeal. See *Wallace v. State,* 562 P.2d 1175 (Okl.Cr.1977).

## V

The appellant, lastly, asserts he was denied effective assistance of counsel. He rests his argument primarily upon the fact that trial counsel advised him to waive a preliminary hearing. The appellant argues that no reasonably competent attorney would waive a preliminary hearing in a first degree murder case, particularly where the State is seeking the death penalty.

█ Recently, in *Johnson v. State,* 620 P.2d 1311 (Okl.Cr.1980), this Court abandoned the sham and mockery test for determining whether the accused received effective assistance of counsel and adopted a higher standard of review. The present test is whether defense counsel exercised "the skill, judgment, and diligence of a reasonably competent defense attorney." *Johnson v. State,* supra at 1313; see also *Manning v. State,* 630 P.2d 327 (Okl.Cr. 1981).

█ We have held in prior case law and continue to hold that the burden of proof is on the appellant to demonstrate inadequate representation. See *Walker v. State,* 550 P.2d 1339 (Okl.Cr.1976). It is the responsibility of the appellant to establish that trial counsel's skill, judgment, and dili-

gence did not rise to the level of reasonable competence, unless it is clear from the record that the defendant was denied adequate representation, thereby denying him a fair and impartial trial as guaranteed by the due process clause.

 In this case, the appellant baldly asserts that trial counsel's advice to waive the preliminary hearing establishes per se that he was denied reasonably competent assistance of counsel. The record before this Court, however, demonstrates otherwise. Trial counsel filed the necessary pretrial motions, and competently cross-examined the State's witnesses. We are unable to hold that there were no valid reasons for waiving preliminary hearing. Further, the appellant has failed to establish he was prejudiced by counsel's advice to waive the preliminary hearing.

Therefore, the judgment and sentence is AFFIRMED.

The Honorable Hez J. Bussey having certified his disqualification, the Honorable Joe Young, Presiding Judge of Judicial District No. 4, was appointed by the Chief Justice of the Oklahoma Supreme Court to participate in this matter.

BRETT, P. J., and YOUNG, J., concur.