2005 WY 8

**William Paul GUNNETT, Appellant (Defendant),**

v.

**The STATE of Wyoming, Appellee (Plaintiff).**

No. 03–150.

Supreme Court of Wyoming.

Jan. 27, 2005.

Representing Appellant: Kenneth M. Koski, State Public Defender; Donna D. Domonkos, Appellate Counsel; and Ryan R. Roden, Senior Assistant Appellate Counsel. Argument presented by Mr. Roden.

Representing Appellee: Patrick J. Crank, Wyoming Attorney General; Paul S. Rehurek, Deputy Attorney General; D. Michael Pauling, Senior Assistant Attorney General; and Robin Sessions Cooley, Deputy Attorney General. Argument presented by Ms. Cooley.

Before HILL, C.J., and GOLDEN, KITE, and VOIGT, JJ, and STEBNER, DJ.

HILL, Chief Justice.

[¶1] Appellant, William Paul Gunnett (Gunnett), contends that his conviction for aggravated assault and battery should be reversed because the district court allowed a juror to communicate with his wife, during the course of the jury's final deliberations, in order to assess whether that juror was suffering confusion as the result of his medical condition. We will affirm.

## ISSUES

[¶2] Gunnett articulates this issue:

Whether the district court erred in the course of action it took in assessing and determining whether a juror was confused during deliberations, based upon a juror's baseless allegation, when it authorized and directed the alleged confused juror's wife to conduct the inquiry, to the prejudice of [Gunnett] and in violation of his rights to a fair and impartial jury.

The State reduces its statement of the issue to the query: "Whether [Gunnett] received a fair trial by an impartial jury?"

## FACTS

[¶3] The facts underlying Gunnett's crime are of very little significance. It suffices, for the sake of context, to note that Gunnett was involved in a drunken brawl. Gunnett got into a fight with a fellow inebriate and was attacked by him. During the fight, Gunnett stabbed him with a knife. It was a given that the victim was the aggressor in the fight, and the central issue was whether Gunnett was justified in employing deadly force under the circumstances. At his first trial, the jury was unable to reach a unanimous verdict. The events set out below occurred at his second trial.

[¶4] The facts pertinent to this appeal arose at 5:50 p.m., on April 3, 2003, at the very end of Gunnett's trial. The jury had reached a decision and was called into the

courtroom to deliver its verdict. The presiding judge read aloud the verdict that the jury had found Gunnett guilty of the charged crime. Defense counsel asked that the jury be polled. The trial judge asked the clerk of court to poll the jury. When asked if that was her verdict, the first juror answered, "Yes." However, the second juror (Juror 2)[1] answered "No." Each of the other ten jurors responded "Yes."

[¶ 5] The trial court then provided the jury this oral instruction:

As explained to you, Ladies and Gentlemen of the Jury, before a Court can accept the verdict, it must be unanimous. There's indication that it may not be. I need to excuse you right now and confer with counsel about what type of instruction, if any, we may give you. So the Court will be in recess.

A brief conference was held between the trial court and counsel, and it was agreed that the jury should be instructed that it must be unanimous in its decision and should continue its deliberations. The oral instruction given the jury was this:

Ladies and Gentlemen of the Jury, as you were previously instructed, jury verdicts in Wyoming must be unanimous. You are invited to review the jury instructions previously given to you, and we're going to send you back into the jury room for further deliberations.

Court will be in recess until you've reached your verdict.

[¶ 6] At this point, Juror 2 spoke up and said: "I thought we reached a verdict." A fellow juror responded: "We did, but you said no. When you answered no, that's what's doing all of this." The jury panel then left the courtroom and returned to its deliberations.

[¶ 7] At 6:14 p.m., court and counsel met outside the presence of the jury, and this discussion was had:

THE COURT: We're on the record outside the presence of the jury, but in the presence of the Defendant and counsel. The bailiff has reported to me[2] that [Juror 2] has exhibited some nonsensical behavior to the rest of the jury, appears to be confused. He is a diabetic. There's some concern as to whether or not he needs insulin.

Before going on the record, I discussed with counsel the possibility of recalling our alternate, who was told to give us a number in case we needed him; however, [defense counsel] informed me he struck up a conversation with [the alternate] at some length after he was dismissed from the panel.

[¶ 8] The trial court decided that it would telephone Juror 2's wife to obtain information. The court was unable to resolve anything over the phone and asked the wife to come to the courthouse. Once she was en route to the courthouse, defense counsel requested a mistrial "on the basis that now

---

1. Earlier in the proceedings, the district court and counsel, as well as the other jurors, became aware that Juror 2 suffered from diabetes and needed to take his insulin regularly.

2. At the outset of the trial, the jury was introduced to the bailiff and instructed: "If it is necessary for a juror to request something or if they think they need to contact someone outside the proceedings for personal reasons, it's got to be done with the Court's permission and through the bailiff. So, he's the fellow that you need to tell first. He's required then to tell me and the lawyers for the case so that everyone will know what's going on."

Prior to the trial, in the presence of the jury, the bailiff was also given an oath: "Do you solemnly swear that you will take charge of this jury, that you will not communicate with them yourself about the case or allow anyone else to communicate with them; and when so directed, you will return them into this Court?"

Just before the jury initially retired to deliberate, the trial court asked the jury if there was anyone of them who did not feel capable of deliberating for health reasons. No juror responded to that inquiry, and the alternate was excused, but with directions to leave a phone number in case he was needed.

Before the jury retired to deliberate, the bailiff was given a second oath: "Do you solemnly swear that you will take charge of this jury and keep them together, not permit the jurors to communicate with anyone except themselves, not converse with them yourself about the case, except to perhaps ask them if they have agreed upon a verdict; and that you will not communicate the status of their deliberations before the verdict is returned? Lastly, do you swear when they have agreed upon a verdict, you will return them into this Court?"

we've got at least one person coming in to check on the juror while the juror is sick and confused." The prosecutor argued against the motion for mistrial and suggested that, since the hour was now late, the jury should retire for the night and resume its deliberations the following day. The trial court took the mistrial motion and the recommendation that the jury retire for the day under advisement, but decided to await the arrival of Juror 2's wife.

[¶ 9] At 6:43 p.m., the wife of Juror 2 arrived at the courthouse, and the district court gave her these directions:

The bailiff indicated to us that your husband was experiencing some mental confusion about the process and maybe had said some nonsensical things, so I want to make sure that you're here to take care of him; and if he needs medical attention give it to him.

To try to maintain the integrity of the trial, if we can, I just want to make sure that you understand that jurors are not permitted to discuss the case that they are deliberating about with anybody, except each other. So, you know, please don't talk to any other jurors or please don't talk to your husband about the case. But we certainly want you to check up on his health concerns.

[¶ 10] Juror 2's wife expressed her understanding of the trial court's directions, and she left the courtroom to speak with her husband. Defense counsel objected to that arrangement, i.e., the wife going to talk to her husband in the jury room. The district court explained that she was not going to be in the jury room, but in the hallway, and not in the presence of any other jurors. Defense counsel renewed his motion for a mistrial on the basis that there was no way to assess how long Juror 2 had been confused, and he might well have been confused throughout the trial.

[¶ 11] At 6:57 p.m., Juror 2's wife returned to the courtroom and related that she did not believe her husband was having an insulin reaction and that she did not perceive that he was confused. The trial court then made a decision to allow the jury to resume its deliberations. Defense counsel again renewed his motion for mistrial, this time on

the basis that the remainder of the jury "may be putting heat on him and, in effect, twisting his arm to get him to agree with the rest of them." The district court again denied the motion for mistrial.

[¶ 12] At 7:10 p.m., the trial court, counsel, Gunnett, and the bailiff assembled in the courtroom. The bailiff reported to the court that the jury "should know in about ten minutes if they are going to make any headway." Defense counsel objected to "giving the jury ten minutes to make headway." He renewed his motion for mistrial based on all the proceedings that followed the polling of the jury, opining that: "It's fairly clear that he wasn't confused, that he knew what he was doing and that there was an attempt by this jury to, in effect, pull a fast one; and I object and ask for a mistrial." The trial court then made clear on the record that the jury was not in any way limited to ten minutes, rather that was their request, and the trial court intended to honor it.

[¶ 13] The jury continued its deliberations for about 15 minutes and indicated that it had reached a verdict. The verdict was read aloud by the court, and it again was a guilty verdict. The trial court again polled the jury. This time Juror 2 responded "Uh-huh—yes." Defense counsel then indicated that it would file a motion for mistrial or a motion for new trial. In response, the district court addressed Juror 2:

[Juror 2], you indicated at our previous polling that it was not your verdict; and I'm sure that counsel is concerned that you received some sort of undue pressure to change your mind. Is—I'm not trying to get into a big dialogue, but did you feel like you were pressured to reach this verdict?

Juror 2 responded, "Oh, heavens no." Court was adjourned and the jury left at 7:38 p.m. However, proceedings continued in chambers immediately thereafter, and defense counsel renewed his mistrial motion, as well as a motion for new trial. Defense counsel also indicated that he would formally file those motions in writing.

[¶ 14]. On April 16, 2003, a motion for new trial was filed, based on "the best interests of

justice and jury misconduct." It was set for hearing on May 9, 2003. At the hearing, defense counsel indicated he did not have any additional information for the trial court and that the motion had been "investigated," but he had been unable "to turn up anything further with respect to it." The State did not file a written response, although the prosecutor did make an oral argument reciting some pertinent authority. By order entered on May 28, 2003, the district court denied Gunnett's motion for a new trial.

## STANDARD OF REVIEW

[¶ 15] The question of whether to grant or deny a motion for new trial is a matter addressed to the discretion of the trial court. The trial court's decision will not be reversed without a showing of abuse of that discretion. A trial court abuses its discretion when it could not have reasonably concluded as it did. In this context, "reasonably" means sound judgment exercised with regard to what is right under the circumstances and without doing so arbitrarily or capriciously. *Robinson v. State*, 2003 WY 32, ¶ 18, 64 P.3d 743, ¶ 18 (Wyo.2003).

[¶ 16] The question posed is answered in part by reference to W.R.Cr.P. 31(d):

**Rule 31. Verdict.**

(a) *Return.*—The verdict shall be unanimous. It shall be returned by the jury to the judge in open court.

(b) *Several defendants.*—If there are two or more defendants, the jury at any time during its deliberations may return a verdict or verdicts with respect to a defendant or defendants as to whom it has agreed; if the jury cannot agree with respect to all, the defendant or defendants as to whom it does not agree may be tried again.

(c) *Conviction of lesser offense.*—The defendant may be found guilty of an offense necessarily included in the offense charged or of an attempt to commit either the offense charged or an offense necessar-

ily included therein if the attempt is an offense.

(d) *Poll of Jury.*—**When a verdict is returned and before it is recorded the jury shall be polled at the request of any party or upon the court's own motion. If upon the poll there is not unanimous concurrence, the jury may be directed to retire for further deliberations or may be discharged.** [Emphasis added.]

[¶ 17] W.R.Cr.P. 31(d) is very similar to its federal counterpart, F.R.Cr.P. 31(d),[3] and it is well known that we often look to federal precedents when construing our own identical or similar rules. *See, e.g., Hoos v. State,* 2003 WY 101, ¶ 10, 75 P.3d 609, ¶ 10 (Wyo. 2003). In their treatise on federal practice and procedure, Professors Wright, King, and Klein provide this guidance:

A verdict is not valid and final until the deliberations are over, the result is announced in open court, and no dissent by a juror is registered. Before the verdict is recorded, the jury must be polled at the request of any party or on the court's own motion. The purpose of this procedure, required by Rule 31(d), is to ascertain with certainty that each of the jurors approves of the verdict as returned, and that no one has been coerced or induced to agree to a verdict to which he has not fully assented.

It is reversible error to deny the defendant a reasonable opportunity to have the jury polled. The defendant must make a seasonable demand, however, or he will be held to have waived a poll. The court can always poll the jury on its own motion. The procedure for a poll applies to not guilty verdicts just as it does to guilty verdicts.

Until the rule was amended in 1998, it had been silent on how a jury poll was to be conducted and it was thought this was within the discretion of the court. There had been general agreement that it is better that the jurors be polled individually

---

3. The language of the federal rule is this:

(d) **Jury Poll.** After a verdict is returned but before the jury is discharged, the court must on a party's request, or may on its own, poll the jurors individually. If the poll reveals a lack of unanimity, the court may direct the jury to deliberate further or may declare a mistrial and discharge the jury.

rather than collectively, and the rule was amended to require this method.[4]

Although it is not the purpose of polling the jury to invite each juror to reconsider his decision, a juror is clearly entitled to change his mind when polled about a verdict to which he had agreed in the jury room. If upon the poll the jury is not unanimous it may be directed to retire for further deliberations or it may be discharged. The court may also repoll the jury if this seems advisable. The court necessarily has much discretion about what to do under these circumstances, but it must take great care to avoid any action that may coerce a unanimous verdict.

3 Charles Alan Wright, Nancy J. King & Susan R. Klein, Federal Practice and Procedure: Criminal 3d § 517, at 52–62 (2004); *also see Harris v. State,* 933 P.2d 1114, 1121–22 (Wyo.1997) (trial court properly may ask for clarification of juror's oral response during polling of jury, so long as it is not in any way coercive); and *see generally* 23A C.J.S. *Criminal Law* §§ 1388–1401 (1989), and 50A C.J.S. *Juries* §§ 508 and 512 (1997).

▆▆▆ [¶ 18]　However, once the jury returned to the jury room, but before it resumed its deliberations, the trial court received a communication from others on the jury, through the bailiff, that Juror 2 appeared to be confused and saying nonsensical things. Thus, in this case we are required to move beyond that basic procedure because Juror 2 had some communication with his wife during the jury's deliberations. The law is well settled that it is improper for a juror to have any out-of-court communications with witnesses, the court, parties, or counsel concerning a case. However, a mere showing of improper communication is not sufficient, prejudice must also be shown. *Skinner v. State,* 2001 WY 102, ¶¶ 12–15, 33 P.3d 758, ¶¶ 12–15 (Wyo.2001); *also see State v. Weisz,* 2002 ND 207, ¶ 11, 654 N.W.2d 416, ¶ 11, (N.D.2002) (telephone call received by juror during supper break, in which juror was informed his wife had been in accident, while being an impermissible communication, did

not constitute obvious error denying defendant fair trial).

[¶ 19]　W.R.E. 606(b) also plays a role in this case:

(b) *Inquiry into validity of verdict or indictment.*—Upon an inquiry into the validity of a verdict or indictment, a juror may not testify as to any matter or statement occurring during the course of the jury's deliberations or to the effect of anything upon his or any other juror's mind or emotions as influencing him to assent to or dissent from the verdict or indictment or concerning his mental processes in connection therewith, nor may his affidavit or evidence of any statement by him concerning a matter about which he would be precluded from testifying be received, but a juror may testify on the questions whether extraneous prejudicial information was improperly brought to the jury's attention or whether any outside influence was improperly brought to bear upon any juror.

[¶ 20]　This rule greatly limits the authority of the district court to make any sort of detailed inquiry with respect to jury deliberations in a case such as this. *See* 27 Charles Alan Wright & Victor James Gold, Federal Practice and Procedure: Evidence § 6075 (1990).

## DISCUSSION

▆▆ [¶ 21]　In his brief, Gunnett makes a wide-ranging argument that his trial, and especially the verdict portion of the trial, was unfair and inaccurate because of the events set out more fully above. To some extent, Gunnett's assertions of error gain strength from the circumstance that at his first trial the jury was unable to reach a unanimous verdict, and a mistrial was declared.

[¶ 22]　At the outset, we will eliminate one avenue of argument pursued by Gunnett. Our cases dealing with the presence of an alternate juror who is present in the jury room during jury deliberations, and the presumption of prejudice that goes with that situation, is not pertinent to our discussion in

---

4.　Wyoming's version of this rule does not reflect the 1998 amendment. However, it is our experience that trial courts virtually always conduct an

individual poll of the jury, and that was done in this instance.

this case. *See Hoos*, 75 P.3d 609; and *Mc-Adams v. State*, 2003 WY 104, 75 P.3d 665 (Wyo.2003).

[¶ 23] Because Gunnett's argument is not precisely focused, it falls to this Court to isolate the issues that are of significance here. We will rely in great part on the allegations contained in the motion for new trial. That was the document that the trial court had to rely upon in deciding the motion. Gunnett asserted that the jury sent a note to the trial judge to the effect that Juror 2 was "hopelessly confused." Of course, the record will only support that the bailiff reported to the trial judge that the jury informed him they were concerned about Juror 2 because he seemed confused and had said some nonsensical things. Of course, the record supplies some support for such a concern because it appears from the record that Juror 2 did not realize that he answered "No" during the jury poll, and further that he did not comprehend that that was the reason the jury was being sent back to deliberate. In addition, it was known to all participants that Juror 2 was diabetic and that he routinely took insulin. The focus of the district court's concern at that juncture was the well-being of the juror. The trial court opted to have Juror 2's wife check on him so as to ascertain if he could continue his role as a juror. After hearing the report from his wife, the district court was satisfied that Juror 2 was all right and could continue to serve as a juror. The jury then continued its deliberations and reached a unanimous verdict. The thrust of the motion for new trial was summarized like this: "The actions by the jury indicate a desire by the jury to get an alternate [5] placed on the jury and were extremely misleading to the Court which believed the juror to be confused based upon the jury's assertions to the Court."

[¶ 24] Gunnett's appeal follows a different tack from that pursued in the trial court, focusing here on what he characterizes as improper contact between Juror 2 and his wife, as well as the district court's brief questioning of Juror 2 as to whether he had been coerced during the jury's final 15 minutes of deliberations. In support of these contentions, Gunnett relies in significant part on our cases in which an alternate (13th juror) is allowed to participate in the jury's deliberations.

[¶ 25] The general discussion of issues such as those at issue here reveals that the variety of problems that can arise in such context are many indeed. 27 Wright & Gold, *supra*, § 6075. In such circumstances, many courts have abandoned the "presumption" mechanism in favor of common sense inquiries into the likely effect of the information or influences on the average juror:

> Under all of these standards, the court must attempt to draw inferences as to the probable effects of the extraneous information or outside influence in light of objectively apparent facts about the context in which those matters came to the jury's attention. Thus, probable effect is estimated in light of the importance of the issue to which the information or influence related, the nature of the information or influence, the strength of the admitted evidence supporting the verdict, the number of jurors exposed to the information or influence, when the jury was exposed to the information or influence, how long the jury discussed these matters during deliberations, the manner in which the court dealt with the information at trial, and any other matters which logically might have a bearing on the effect of the information or influence on the jury.

27 Wright & Gold, *supra*, § 6075, at 469–71; *and see Wiser v. People*, 732 P.2d 1139, 1142–44 (Colo.1987). Although the district court did not explicitly engage in such an analysis, it is evident that it tacitly employed a "common sense" approach throughout this episode.

[¶ 26] With respect to the allegation that Juror 2 was "confused" and saying "nonsensical" things, courts have refused to treat allegations of physical or mental incompetence as raising an issue of "outside influence." 27 Wright & Gold, *supra*, § 6075, at 458; *and see Keller v. State*, 651 P.2d 1339, 1342–43 (Okl.Cr.1982) (Verdict could not be

---

5. Of course, at this point in the proceedings, an alternate juror was no longer available to be substituted for Juror 2 because of defense counsel's contact with him.

impeached by juror's affidavit that she did not think defendant had been proven guilty but acceded to guilty verdict because she "was so tired."); and *United States v. Dioguardi*, 492 F.2d 70, 78 (2nd Cir.1974) ("It is well settled that only clear evidence of a juror's incompetence to understand the issues and to deliberate at the time of his service requires setting aside a verdict. And only strong evidence that it is likely that the juror suffered from such incompetence during jury service will justify an inquiry into whether such incompetence in fact did exist."). Here, the impermissible contact did not relate to any issue in the case. Indeed, it appears no "extraneous" information of any sort was conveyed to Juror 2. Only Juror 2 was affected by the contact, and the record gives us no cause to speculate to the contrary.

## CONCLUSION

[¶ 27] We hold that the trial court did not err in its handling of the issues that arose after the initial poll of the jury. The record does not support the assertion that there was any improper interaction between the jury and the bailiff, the bailiff and the court, or the court and the jury. The record does not support speculation that Juror 2 was not competent to continue his jury service in these circumstances. Likewise, the record does not support the very speculative assertion that the jury was attempting to unseat Juror 2, in favor of an alternate, because it viewed Juror 2 as incompetent and leaning toward acquittal. The brief contact between Juror 2 and his wife does not support that the wife's inquiry into her husband's well-being prejudiced the defendant in any way. The trial court did not improperly inquire into Juror 2's reasoning process by asking him if he had been coerced into changing his vote. Indeed, the only reasonable view of the record is that Juror 2 misspoke during the initial jury poll, saying "No," when he intended to say "Yes." A reasonable review of the record most strongly supports that any perception the other jurors may have had that Juror 2 was confused and speaking nonsensically arose from his lack of awareness that he had said "No," when he intended to say "Yes."

[¶ 28] Finding no basis to hold that the district court abused its discretion, or that the defendant's right to a fair trial was prejudiced by the proceedings below, the judgment and sentence of the district court are affirmed.