**Roger Dale STAFFORD, Sr., Appellant,**

v.

**The STATE of Oklahoma, Appellee.**

**No. F–80–256.**

Court of Criminal Appeals of Oklahoma.

Sept. 7, 1983.

Rehearing Denied Oct. 6, 1983.

Garvin A. Isaacs, Oklahoma City, for appellant.

Jan Eric Cartwright, Atty. Gen., Susan Talbot, Asst. Atty. Gen., Chief, Criminal Div., State of Oklahoma, Oklahoma City, for appellee.

## OPINION

BUSSEY, Presiding Judge:

The appellant, Roger Dale Stafford, Sr., stands convicted in this case of three counts of Murder in the First Degree. He was tried before a jury in the District Court of McClain County, Oklahoma, the Honorable Kenneth Love, Associate District Judge, presiding. The appellant's sentence for each murder was fixed at death, and he appeals therefrom.

The appellant, his wife (Verna Stafford) and their three children were transients who arrived in Tulsa, Oklahoma in June of 1978. Shortly thereafter, the appellant met up with his brother, Harold Stafford.

On June 21, the appellant, Verna, and Harold embarked upon a journey with the purpose of finding an Oklahoma City establishment to rob. All of the targeted sites were too busy, so they drove to Pauls Valley to look for motels to rob. Having examined the number of cars in the parking lots of each of the motels they visited, it was determined that it would not be profitable to rob any of the motels.

As they drove back to Oklahoma City, the trio decided to stop their car, raise the hood, and feign distress, in hopes that a wealthy good samaritan would come along. Verna attempted to flag down by-passing cars as the appellant and Harold lay in wait in the darkness beside the car.

After a period of time, a blue Ford Ranger pickup with a white camper shell pulled off the road, and the driver, Sergeant Melvin Lorenz, exited the vehicle to help Verna. Mr. Lorenz looked at the Stafford automobile, and informed Verna that he could detect no mechanical difficulties. At that point, the appellant and Harold approached Sergeant Lorenz and demanded his wallet. The appellant was armed with a pistol. Sergeant Lorenz informed the appellant that he and his family were on their way to his mother's funeral in North Dakota, and that he could give the appellant some money, but not all that he had.

Upon hearing this, the appellant shot the Sergeant two times. Sergeant Lorenz'

wife, Linda Lorenz, heard the gunshots, and ran toward Verna Stafford from the pick-up. Verna knocked Linda Lorenz to the ground. The appellant shot her as she fell.

The three then heard dogs barking and a child calling from the back of the camper. The appellant approached the camper, produced a knife, cut a hole in the screen, and fired his pistol into the darkness. The bullets from the pistol forever silenced the voice of eleven-year-old Richard Lorenz.

The appellant and Harold dragged the bodies of Sergeant and Mrs. Lorenz into a field adjacent to the highway where they were stopped. The appellant and Harold drove the Lorenz vehicle approximately three-fourths (¾) of a mile down the highway, and dumped the body of Richard Lorenz in a field at that point. They then drove the pickup to Will Rogers Airport in Oklahoma City. Verna followed them in the Stafford automobile.

Upon arriving at Will Rogers, Verna parked the Stafford automobile and got in the Lorenz' pickup with the appellant and Harold. The trio drove to Stillwater, Oklahoma. They eventually returned to Will Rogers and abandoned the pickup. The appellant drove the Stafford vehicle back to Tulsa, while Harold and Verna hitchiked to Tulsa.

Much additional evidence was adduced at trial concerning eyewitness identification of the appellant, Verna and Harold at various points throughout the evening and night of June 21–22, 1978; of the appellant's employment; and of various other matters which shall be discussed only as they become pertinent to the appellant's allegations of error.

## I. PRE–TRIAL

The appellant argues a change of venue should have been granted in this case. In support of his allegation, he points out the fact that there was widespread publicity throughout Oklahoma concerning this case; and, additionally, that he had been convicted of the "Sirloin Stockade murders" shortly prior to his trial for the Lorenz murders.

■■■ Trial counsel for the appellant failed to follow the proper procedure as set forth in our statutes to apply for a change of venue. See, 22 O.S.1981, § 561. The motion was not verified by affidavit, and was not supported by the requisite affidavits of at least three credible persons residing within the county. Thus, the motion was not properly before the trial court, and is not properly before this Court.[1] *Ake v. State,* 663 P.2d 1 (Okl.Cr.1983).

In a related assignment of error, the appellant argues the trial court should have conducted the voir dire of the veniremen on an individual basis.

We have held numerous times that the decision whether to voir dire the prospective jurors individually is a matter of the

---

1. Due to the fact that the appellant has been sentenced to death in this case, and that he argues trial counsel rendered ineffective assistance, we have also considered the issue on its merits. We conclude that the motion for change of venue was properly denied.

The mere fact that there was much publicity concerning this crime, the "Sirloin Stockade murders" and the appellant's implication in both does not by itself establish that the appellant could not receive a fair trial in McClain County. *Shapard v. State,* 437 P.2d 565 (Okl. Cr.1967). It is not surprising that all of the veniremen had heard of the appellant. However, the appellant was not entitled to be tried before a jury completely ignorant of the facts and circumstances surrounding the case. The trial court questioned each venireman to expose potential bias, and counsel was afforded wide latitude in examination of the jury panel. The record reflects that those ultimately selected to sit as the jury said they were able to ignore any information concerning the appellant they may have garnered from media sources. It was sufficient that each juror stated he/she could disregard any opinion he/she may have had, and render a verdict based on the evidence presented. *Irvin v. Dowd,* 366 U.S. 717, 81 S.Ct. 1639, 6 L.Ed.2d 751 (1961); *Russell v. State,* 528 P.2d 336 (Okl.Cr.1974).

The decision whether to grant a change of venue rests within the discretion of the trial court, not to be disturbed absent an abuse of that discretion. *Thomsen v. State,* 582 P.2d 829 (Okl.Cr.1978). Since we do not believe the record will support an assertion that the inhabitants of McClain County were so prejudiced against the appellant that a fair and impartial trial was not possible, we find no abuse of discretion.

trial court's discretion. *Morrison v. State,* 619 P.2d 203 (Okl.Cr.1980); *Irvin v. State,* 617 P.2d 588 (Okl.Cr.1980); *Vavra v. State,* 509 P.2d 1379 (Okl.Cr.1973); *Gonzales v. State,* 388 P.2d 312 (Okl.Cr.1964).

■ Although we agree that, in proper cases, conducting individual voir dire may be useful and appropriate; see, *Nebraska Press Assn. v. Stuart,* 427 U.S. 539, 96 S.Ct. 2791, 49 L.Ed.2d 683 (1976); we do not believe the trial court committed error by refusing to do so in the present case.

As noted earlier, in addition to the trial court's preliminary questions, counsel for the appellant was given great latitude to ferret out potential juror bias. Indeed, the transcript of the voir dire reflects that those who had preconceived opinions of the appellant's guilt or innocence, or had doubts about their ability to be impartial, or had reservations about the death penalty, freely stated so.[2] The remaining veniremen admitted they had been exposed to media accounts of the "Sirloin Stockade murders" as well as the Lorenz murders. However, counsel questioned each in detail to ensure each could and would dispel those accounts from their minds.

We have no reason to believe the atmosphere of the voir dire prohibited the veniremen from honestly expressing their emotions concerning this case. There was no need for individual voir dire, thus no abuse of discretion.[3]

In his third allegation of error, the appellant argues the court erred in excusing a potential juror under *Witherspoon v. Illinois,* 391 U.S. 510, 88 S.Ct. 1770, 20 L.Ed.2d 776 (1968).

■ The form and substance of the questions posed the venire panel by the trial court were in compliance with those we have approved in *Chaney v. State,* 612 P.2d 269 (Okl.Cr.1980). Additional questions were asked by the judge to ensure he did not commit the error the appellant alleges today. A review of the discourse between the trial court and prospective juror Smith reveals no violation of *Witherspoon.*[4] It is apparent that Ms. Smith had predetermined she would vote against imposition of the death penalty, regardless of the evidence presented in support of it. *Witherspoon,* supra, at note 21. Ms. Smith was properly excused.

## II. THE GUILT STAGE

Two of the appellant's allegations of error concern the fact that testimony was admitted at trial concerning conversations had between Verna Stafford and himself. The allegations specifically concern: 1) conversations held in a Tulsa restaurant in the presence of Harold Stafford, to which conversations Verna testified at the appellant's trial; and 2) that of an argument had between Verna and the appellant, which argument was overheard by a third person who testified concerning the content of the argument at the appellant's trial.

The appellant argues that the testimony in both instances concerned privileged husband-wife communications, protected by Laws 1953, p. 52, § 1, codified as 12 O.S. § 385 (now repealed). He argues that, although the statute has subsequently been repealed, it was in force at the time the conversations were held, thus it should have been controlling at trial.

■ The appellant is mistaken in his belief that section 385 was in force in June of 1978, when the conversations were had. That statute was repealed by Laws 1977, c. 265, § 13, codified as 12 O.S. § 418.4 (now repealed), effective October 1, 1977. Thus,

2. Mrs. Furr (Tr. 16–17, 24–25, 34–35); Mr. Bartley (Tr. 75–77); Mrs. Beck (Tr. 125, 132–137); Mrs. Abney (Tr. 157–159); Mrs. Young (Tr. 160–162); Mrs. Smith (Tr. 194–196); Mrs. Morehead (Tr. 245–249).

3. The appellant has provided us with examples of several states whose legislatures have made special statutory provisions to afford defendants in capital cases the opportunity to individually voir dire veniremen. As stated above, however, we do not believe individual voir dire was necessary in the present case, and are not persuaded by the legislatively enacted criminal procedure of other states.

4. See Appendix A

the appellant's argument fails from the outset. However, even if we apply the appellant's argument to Section 418.4 (which, we note was repealed effective October 1, 1978, by Laws 1978 c. 285 § 1102, now codified as 12 O.S.1981, § 3102),[5] we conclude the argument has no merit. The changes outlined above constituted changes in procedure only, and did not affect the substantive rights of the appellant. See, *Taylor v. State,* 640 P.2d 554 (Okl.Cr.1982). Thus, the appellant did not have a right to be governed by the prior statute, regardless of which one he thought to be in force. See, *Dobbert v. Florida,* 432 U.S. 282, 97 S.Ct. 2290, 53 L.Ed.2d 344 (1977); *Thompson v. Missouri,* 171 U.S. 380, 18 S.Ct. 922, 43 L.Ed. 204 (1898).

■ In addition to his argument concerning the repealed 12 O.S., § 385, the appellant argues that Laws 1957, p. 167, § 1, codified as 22 O.S., § 702 (now repealed) should have controlled the admissibility of the evidence concerning the conversations he had with Verna. Section 702, which was still valid at the time of the appellant's trial, was more restrictive than 12 O.S.1981, § 2504, which was also in force. The evidence would not have been admissible under Section 702. However, as we stated in *Taylor v. State,* supra; and *Lavicky v. State,* 632 P.2d 1234 (Okl.Cr.1981), it is our opinion that Section 702 was superceded by

Section 2504. We note that the legislature has subsequently repealed § 702 (Laws 1982, c. 269, § 2, effective October 1, 1982), thereby lending force to our conclusion.

We therefore conclude that the sole statute controlling the admissibility of the conversations had between the appellant and his wife was 12 O.S.1981, § 2504. Having settled that issue, we turn now to our determination of whether the evidence was properly admitted under that statute.

Section 2504(B) limits the marital privilege in criminal cases to "confidential communications." According to Section 2504(A),

A communication is confidential for purposes of this section if it is made privately by any person to his spouse and is not intended for disclosure to any other person.

See also, *Lavicky v. State,* supra.

■ In the present case, the conversations to which Verna Stafford testified all occurred in the presence of Harold Stafford. None of the conversations she testified to fell under the above definition of confidential communications. We are convinced that Verna Stafford's testimony was properly admitted at trial.[6]

■ We also find that the argument between the appellant and Verna, which

---

**5.** The statute governing the admissibility of Husband-Wife communications is 12 O.S.1981, § 2504. Title 12 O.S.1981, § 3102 is the repealer which serves to facilitate the authority of § 2504.

**6.** The appellant argues this reasoning improperly permits the "bootstrapping" of Verna Stafford's testimony, because the only way to prove the conversations were not confidential under § 2504(A) and (B) was to allow Verna to testify they were not.

We would first point out that the bulk of Verna Stafford's testimony concerned overt acts committed by the appellant, Harold and herself. These acts did not constitute confidential communications. See, *Pereira v. United States,* 347 U.S. 1, 74 S.Ct. 358, 98 L.Ed. 435 (1954); *Wolfle v. United States,* 291 U.S. 7, 54 S.Ct. 279, 78 L.Ed. 617 (1934); *United States v. Lustig,* 555 F.2d 737 (9th Cir.1977). Thus, there is no marital privilege issue involved with most of Verna's testimony.

The substance of Verna's testimony concerning the conversations had in Harold's presence was that the three met several times at a Tulsa restaurant to discuss their financial problems, and that after obtaining a gun, conspired to commit a robbery in Oklahoma City. Verna was under oath when she testified to these matters. Her testimony in other areas was corroborated by other witness' testimony. We have held that if the testimony of an accomplice is corroborated in one material fact by independent evidence tending to connect the defendant to the crime, it may be inferred by the trier of fact that the rest of his testimony is also true. *Nation v. State,* 478 P.2d 974 (Okl. Cr.1970).

We therefore believe the trial court was justified in permitting Verna to testify that Harold was present during certain conversations, and in allowing her to testify as to the substance of those conversations.

was overheard by a third party, was not a "confidential communication" within the meaning of Section 2504(A) and (B). The argument occurred in a hotel parking lot at midnight on July 17, 1978. It became so loud that it attracted the attention of a young woman who was staying in the hotel. The woman testified at trial as follows:

MS. HUFF:

Q. What do you remember happening and what was being said?

WITNESS:

A. Well, I heard yelling, and I looked out the window and I saw it was Verna, you know, and Roger.

And I saw Roger slap Verna real hard, and she went back against the car. I opened the door, and—just a little bit and was watching. And I heard Verna yell she was going to call the police and Roger says, "Go ahead. You'll be in as much trouble as I would." She goes, "But I didn't kill them, Roger. You did."

It is clear in this case that the appellant was conducting himself in a loud manner in a place where he could have no reasonable expectation of privacy. Under these circumstances, the rule espoused in the case of *Seigler v. State,* 54 Okl.Cr. 141, 15 P.2d 1048 (1932) that, ". . . third persons may testify to communications had between husband and wife, overheard by such third persons," (15 P.2d at 1048) applies.[7] Accordingly, the witness' testimony was properly admitted.

In the appellant's eleventh assignment of error, he argues that Verna Stafford was improperly permitted to testify concerning statements made by Harold Stafford. Harold was killed in a motorcycle accident prior to the appellant's arrest, and was thus unavailable for trial.

■ It was the trio's journey in search of something or someone to rob which culminated the murders. Harold conspired with the appellant and Verna to embark upon such an endeavor. Thus, the testimo-

ny concerning conversations in which statements were made by Harold falls under 12 O.S.1981, § 2801(4)(b)(5):

4. A statement is not hearsay if:

b. the statement is offered against a party and is

5. a statement by a coconspirator of a party during the course and in furtherance of the conspiracy.

The testimony was properly admitted.

Two persons who identified the appellant from photographic lineups testified at the appellant's trial. Both of these persons had been hypnotized prior to viewing the photographs. The appellant argues their testimony was improperly admitted. We disagree.[8]

As part of the State's proof that the appellant was in the area of the Lorenz murders at the time they took place, the testimony of Ray Tackett was introduced. Mr. Tackett testified that he saw a pickup matching the description of the Lorenz' pickup parked outside a Stillwater, Oklahoma convenience store at approximately 7:00 A.M. on June 22, 1978; that he was able to observe the driver of the vehicle and its male passenger; that he again saw the pickup parked outside a restaurant in Stillwater approximately thirty minutes later; that he saw the same two men inside the restaurant that he had seen at the convenience store; that a woman was with the men at that time; that, upon learning of the deaths of the Lorenz family on June 22 and 23, he called the Stillwater police concerning the pickup and the persons he had seen; that he met with police on June 26 and related the information herein set forth; that on June 27 he met with an OSBI artist and drew a composite of the two men he had seen associated with the pickup; that approximately six months later he again met with the OSBI artist and drew a composite picture of the woman he

---

**7.** The appellant argues *Seigler* stands for a rule opposite than that stated above. A close reading of *Seigler* reveals the inaccuracy of his argument.

**8.** The appellant also argues that trial counsel's failure to object to the admission of this testimony evidences trial counsel's ineffectiveness. We have taken the argument into consideration in part III of this opinion, infra.

had seen with the two men; that on March 13 or 14, 1979, he met with OSBI agents and was hypnotized twice, once for "practice," and a second time to recall events which transpired the day he saw the pickup and three persons in question; and that he was shown the photographic lineup approximately 45 minutes after the second hypnotism session ended.

It is readily apparent that since the composites and descriptions had been given earlier, the hypnosis did not in any appreciable manner contribute to Tackett's identity of the appellant at the photographic lineup. Photographs were introduced at trial to show the similarity between the composites drawn at Tackett's direction and the actual appearances of the appellant, Verna Stafford, and Harold Stafford.

Pamela Lynch testified she saw the appellant in an automobile on Interstate 240 in Oklahoma City on July 16, 1978. Subsequent to being hypnotized, she also selected the appellant's photograph from a series of photographs. However, as in the case of witness Tackett, all of Ms. Lynch's descriptions of the appellant were given to the police beforehand. There was no error in admitting the testimony under the particular facts of this case.

This Court is aware of its holding in *Jones v. State,* 542 P.2d 1316 (Okl.Cr.1975), and we do not intend to imply today that we depart from the principles therein set forth. The information supplied by these two witnesses most damaging to the appellant was that adduced prior to the hypnosis. Indeed, in the case of Mr. Tackett, the composites prompted the appellant himself to call the police and identify Harold and Verna. It was the appellant's phone call which then set in motion the events which culminated in his arrest.

In light of the overwhelming amount of evidence of the appellant's guilt, we cannot say that the identification of the appellant in a photographic lineup by two witnesses with so much independent information resulted in error or prejudice meriting reversal or modification.

The appellant maintains five photographs of the deceased victims' bodies were improperly admitted into evidence at trial.

Photographs are admissible in criminal trials so long as they are relevant, and their probative value to the jury outweighs their prejudicial impact. 12 O.S. 1981, §§ 2401, 2403. It is within the discretion of the trial court to determine the admissibility of photographs, based on the above standards. *Irvin v. State,* 617 P.2d 588 (Okl.Cr.1980). We will not disturb the trial court's decision absent abuse of that discretion. *Grizzle v. State,* 559 P.2d 474 (Okl.Cr.1977).

The photographs of the victims' bodies as they lay in the fields where they were found demonstrated where and how the bodies were disposed of following the murders. The pictures of Mr. and Mrs. Lorenz taken after they were cleaned up served to demonstrate the points of entry and the nature of the gunshot wounds which caused their death. All the photographs were relevant to the issues at trial, were probative of the crime committed, and were not unduly prejudicial. They were properly admitted. *Glidewell v. State,* 626 P.2d 1351 (Okl.Cr.1981); *Chaney v. State,* 612 P.2d 269 (Okl.Cr.1980).[9]

The appellant next contends that evidence of other crimes was erroneously introduced at his trial.

The prosecutor elicited testimony from the appellant at trial that he had married a second woman while being married to Verna Stafford. The trial court sustained the appellant's objections. Nonetheless, appellate counsel argues the error was fundamental, thereby mandating reversal.

---

**9.** The appellant argues that the two pictures of Mr. and Mrs. Lorenz as they lay in the morgue were similar to those condemned in *Oxendine v. State,* 335 P.2d 940 (Okl.Cr.1958). We find, however, that the photographs did not approach the prejudicial magnitude of the Oxen-dine autopsy photographs. The pictures in this case show no signs that an autopsy had been performed. The only wounds visible were those caused by the bullets fired by the appellant.

We cannot agree that the fact that evidence was brought out that the appellant was a bigamist prejudiced him in this case. The issues before the jury concerned the brutal murder of a family. Much evidence was produced which demonstrated the heartless and heinous manner in which the three deaths were effected at the hands of the appellant. Evidence concerning the appellant's marital misbehavior, to which an objection was sustained, played no prejudicial role in the appellant's judgment and sentences.

Accordingly, we find that this evidence, and the trial court's failure to instruct the jury, constituted harmless error. See, *Chapman v. California,* 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967); *Lemos v. State,* 642 P.2d 279 (Okl.Cr.1982).[10]

## III. EFFECTIVENESS OF TRIAL COUNSEL

The appellant's tenth allegation of error is that trial counsel, Mr. J. Malone Brewer, rendered ineffective assistance. The argument is premised on two grounds: first, that Brewer's representation as a whole was ineffective; and second, that Brewer had contracted with the appellant for all publication rights to the appellant's life, thereby creating a conflict of interest which impaired the effectiveness of Brewer's representation at trial.

### A. COUNSEL'S REPRESENTATION AS A WHOLE

From the outset, we note that the standard by which trial counsel's performance is to be judged is the "farce or mockery of justice" test which existed at the time of the appellant's trial.[11] *Webb v. State,* 612 P.2d 285 (Okl.Cr.1980). The burden of establishing ineffective assistance at trial is upon the defendant, and is a heavy burden. *Felts v. State,* 588 P.2d 572 (Okl. Cr.1978).

The appellant has argued at length in his brief and upon oral arguments the ineffective assistance allegation. In addition to the one argument devoted solely to the issue the appellant has punctuated the entire brief with examples from the transcript intended to support his claim. Many of the instances cited by the appellant, however, are addressed to trial counsel's personal style, which we refuse to "second guess" on appeal. The appellant's burden of proving he was not adequately represented at trial is not sustained by demonstrating possible error in trial counsel's judgment. *Felts,* supra; *Walker v. State,* 550 P.2d 1339 (Okl.Cr.1976).

The fact that trial counsel failed to properly move for a change of venue, failed to move to suppress the testimony of various witnesses, and failed to draft a comprehensive motion for new trial is of no consequence; as we have considered all allega-

10. The appellant also alludes in his argument to testimony given by witnesses Jones, Lynch, Baxter, Childers and Collins. An examination of the testimony of those witnesses, however, reveals that the argument has no merit.

Witnesses Jones, Childers and Baxter were all co-workers of the appellant who identified weapons the appellant had shown them in June or July of 1978. The weapons identified by the three were those which were used in both the Lorenz murders and the "Sirloin Stockade murders." The fact that the weapons had been used in the "Sirloin Stockade murders" and introduced into evidence against the appellant in that trial did not constitute evidence of other crimes here. The weapons and the testimony connecting them with the appellant in this case was limited to implicating the appellant in the Lorenz murders. There was no error.

Witness Collins also identified the three guns as those which she had seen under the appel-

lant's bed as she made it one day at a Tulsa motel. Her identification of the weapons did not constitute evidence of other crimes.

Witness Collins also testified she saw the appellant, Verna and Harold in a car that matched the description of the one given by witness Pamela Lynch on July 16, 1978. Although July 16 was the day on which the "Sirloin Stockade murders" occurred, neither Collins' nor Lynch's testimony went to that fact. This testimony successfully avoided touching on the subject of other crimes.

11. The "farce or mockery" test was replaced in Oklahoma by the "reasonably competent assistance of counsel" test in October of 1980. See, *Johnson v. State,* 620 P.2d 1311 (Okl.Cr. 1980). The appellant's trial was held in May of 1980.

tions on their merits, and have concluded that all the testimony was properly admitted.

Of most concern to us is the appellant's argument concerning Mr. Brewer's representation during the sentencing stage. The appellant argues that Brewer's conduct fell short of the "Farce or Mockery of Justice" standard because; 1) he objected to the instructions after they were given; 2) he presented no evidence in mitigation of the death sentence; and 3) his closing argument was only three transcript pages in length.

■ We must evaluate the appellant's objections in light of the sentencing hearing as a whole. Although it is proper for counsel to object to instructions *before* they are given, failure to do so in this instance was not error. Appellate counsel's only challenge to the propriety of the instructions have been considered and rejected in part IV of this opinion, infra. Thus, it would have merited the appellant nothing had a timely objection to the instructions been made.

■ Secondly, both the State and the appellant incorporated the evidence presented in the first stage as evidence in the second stage. No additional witnesses were adduced by either side. The appellant has failed to demonstrate that any mitigating evidence other than that adduced in the first stage was available. Appellate counsel has asserted the appellant had a brain tumor at the age of twelve, and implied that such a condition may have resulted in psychiatric problems. However, no evidence to substantiate this claim has been produced, and we shall not accept counsel's assertion.[12] See, *Smith v. State,* 659 P.2d

330 (Okl.Cr.1983). See also, *Collins v. State,* 271 Ark. 825, 611 S.W.2d 182 (1981).

■ Thirdly, the brevity of Mr. Brewer's argument in the sentencing stage does not convince us that it was ineffective. The length of the argument paralleled that of the prosecution. The substance contained philosophical and factual arguments concerning the appropriateness of the death penalty in this case. Portions of the argument referred to the appellant's alibi presented in the first stage.

Although the argument may not have been the model closing argument, we cannot judge it by its lack of success. *Smith v. State,* supra. It is to be remembered that trial counsel had the unenviable task of defending a man against whom the State had amassed a great amount of evidence. Brewer conducted a vigorous defense in the first stage, and reurged his position in the second. Brewer's representation was adequate. *Webb,* supra; *Felts,* supra, *Smith,* supra.

## B. THE ALLEGED CONFLICT OF INTEREST

This issue presents a matter of great ethical and judicial concern. The American Bar Association Code of Professional Responsibility specifically prohibits counsel from acquiring an interest in publication rights concerning the matter for which he is employed prior to conclusion of that matter.[13] It is, however, for the Bar to determine the necessity of any disciplinary action pursuant to DR 5–104(B). Our concern in the matter lies in ensuring the appellant's sixth amendment right to adequate representation was protected.

■ To afford relief to the appellant upon these grounds, it must be established

---

**12.** The appellant ties this argument to the conflict of interest argument (See B, infra), and asserts that Brewer presented no evidence concerning this matter because Brewer failed to keep his end of the agreement and finance the defense. We have considered the conflict aspect in part B. We note here that appellate counsel has likewise failed to offer any authority to show that the appellant had any history of psychiatric disorder.

**13.** DR 5–104(B) states:

Prior to conclusion of all aspects of the matter giving rise to his employment, a lawyer shall not enter into any arrangement or understanding with a client by which he acquires an interest in publication rights with respect to the subject matter of his employment or proposed employment.

that an *actual,* not a *possible,* conflict of interests existed. *Cuyler v. Sullivan,* 446 U.S. 335, 100 S.Ct. 1708, 64 L.Ed.2d 333 (1980).[14] Further, it must be established that the actual conflict of interest adversely affected the attorney's performance.[15] *Cuyler v. Sullivan,* supra.

▉ The only evidence in the record supporting the contention that Brewer exchanged his services for the publication rights to the appellant's life story is the affidavit of the appellate attorney, Garvin A. Isaacs.[16] We do not believe that this affidavit, standing alone, is sufficient to establish an actual conflict of interest.

▉ Nonetheless, even were we to assume, *arguendo,* that Brewer had obtained an interest in the publication rights concerning this matter, and that it created a conflict of interest, the appellant is unable to show Brewer's representation was adversely affected thereby.

The appellant attempts to demonstrate an adverse effect by asserting that: 1) Brewer allowed television cameras at the appellant's trial in search of publicity for himself; and 2) the failure to investigate the appellant's psychiatric background (hence the failure to present such a mitigating circumstance) was directly attributable to the alleged contract, because Brewer was supposed to finance such endeavors and failed to do so.

The first argument has no merit, since the appellant personally consented to the presence of the television cameras. (See transcript of proceedings, February 25, 1980 at p. 4). In addition, the appellant has demonstrated no adverse effect from the presence of the television cameras. The jury was sequestered by the court and had no access to the reports produced from the films. There is no evidence of any extraordinary or flamboyant tactics employed by Brewer at trial, or conversely, that he was withdrawn. It simply cannot be said that the television cameras had an adverse effect on Brewer's performance.

The second argument must also fail, since, as stated in part A, supra, no evidence has been offered to establish that the appellant had any history of mental illness.

Lastly, we find this case distinguishable from *People v. Corona,* 80 Cal.App.3d 684, 145 Cal.Rptr. 894 (1978), cited by the appellant.

In *Corona,* it was proven that a publication contract between the defendant and his attorney existed, and a copy was available to the court. Counsel's actions in that case revealed the contract had definite adverse effects on his legal representation of Coro-

---

**14.** Although Sullivan sought federal habeas corpus relief from a state conviction, and the conflict of interests alleged stemmed from multiple representation in *Cuyler v. Sullivan,* the holding has been applied to a case similar to the present. See, *United States v. Hearst,* 638 F.2d 1190 (9th Cir.1980).

**15.** Older cases have established that prejudice must be shown to result from the conflict of interest in situations where counsel has obtained publication rights prior to conclusion of the representation giving rise to the publication contract. See, *Fuller v. Israel,* 421 F.Supp. 582 (E.D.Ill.1976); *Ray v. Rose,* 535 F.2d 966 (6th Cir.1976); *United States v. Hearst,* 466 F.Supp. 1068 (N.D.Cal.1978) (Vacated and Remanded, 638 F.2d 1190 (9th Cir.1980)); *People v. Corona,* 80 Cal.App.3d 684, 145 Cal.Rptr. 894 (1978);

It was stated in *United States v. Hearst,* 638 F.2d 1190, that the "prejudice" requirement is not the same as the "adverse effect" test of *Cuyler v. Sullivan:*

But the requirement that the petitioner show this adverse effect is not the same as the requirement that the petitioner show that counsel's incompetent assistance resulted in actual prejudice. For example, overwhelming evidence of guilt might make almost impossible a showing that a relatively minor error resulted in actual prejudice. But such evidence would be completely irrelevant to an inquiry whether the same error, if caused by an actual conflict of interest, showed an adverse effect on counsel's performance. 638 F.2d at 1194.

**16.** Appendix B contains an excerpt from the transcript in which Brewer is arguing his motion to be compensated for representing the appellant. He makes several references to the contingency that he "could or might" receive compensation. We are not prepared to say these statements are references to potential proceeds from publication rights.

na. Counsel actively sought media coverage during the trial, which behavior prompted the trial court to verbally chastise him on at least two occasions. (145 Cal. Rptr. at 918). In the appellate court's words, "... defense counsel engaged in continuous conduct to try the case in the press, regardless of the fact that the trial publicity was injurious to the interest of his client." (145 Cal.Rptr. at 918).[17]

Brewer's conduct in the present case was clearly not as egregious as the conduct of Corona's attorney. Throughout the trial Brewer made objections, argued points of law, vigorously cross-examined witnesses and attempted to establish an alibi with witnesses for the defense. Although he agreed to the presence of television cameras in the courtroom during the trial, he did not attempt to try the case to the press. We have thoroughly reviewed the record in light of *Corona* and the appellant's allegations and are convinced the appellant received effective assistance of counsel at trial. *Webb,* supra.

## IV. THE PUNISHMENT STAGE

█ The appellant argues that 21 O.S. 1981, § 701.11 unconstitutionally shifts the burden of proof to the defendant in capital cases by requiring him to present evidence in mitigation of the death penalty. In *Parks v. State,* 651 P.2d 686 (Okl.Cr.1982), we held that our statutory scheme did not unconstitutionally shift the burden of proof. In the present case, the jury was properly instructed concerning the aggravating circumstances, the mitigating circumstances, and the burdens of proof associated therewith. The assignment of error cannot stand.

█ The appellant also argues a preliminary hearing on the aggravating circumstances should have been held. We rejected an identical argument in *Brewer v.*

*State,* 650 P.2d 54 (Okl.Cr.1982). Preliminary hearings on the bill of particulars in capital cases are not required.

The appellant additionally maintains fundamental error occurred when the sentencing stage of his trial was not conducted according to the procedure outlined in 22 O.S.1981, § 831.

Immediately after the verdicts of guilt were returned and the jury polled concerning that matter, the trial court read the instructions regarding punishment to the jury. The State then moved to incorporate all the evidence introduced in the first stage into the second stage, and rested. The defense announced it had no evidence to present and rested. The State made its closing argument to the jury, as did the appellant. The State argued in rebuttal, and the jury was sent out to deliberate on the sentence to be imposed.

The appellant argues this procedure was erroneous because 1) the trial court afforded the parties no opportunity to make opening statements; 2) the appellant was given no opportunity to cross-examine witnesses against him by virtue of the State merely incorporating the evidence adduced in the first stage into the second stage; and 3) no opportunity was given the appellant to demur to the evidence.

Title 21 O.S.1981, § 701.10 provides for the separate sentencing stage upon conviction or adjudication of guilt of murder in the first degree. It directs that the State be limited to introduction of evidence in support of the aggravating circumstances enumerated in 21 O.S.1981, § 701.12; and that the defendant be allowed to present evidence concerning any mitigating factors. It also provides that both sides be permitted to present argument for or against imposition of the sentence of death.

---

17. In addition to Corona's trial counsel's conduct directly attributable to the contract for publication rights, the court based its decision on the fact that substantial evidence of Corona's mental illness was deliberately ignored by trial counsel. The evidence of Corona's mental illness was so strong, and defense counsel's

determination to suppress it so great, that the improbable circumstance occurred wherein the trial court and the prosecution demanded Corona undergo psychiatric testing, while the defense vehemently objected. The court could not excuse counsel's behavior as a matter of trial strategy.

■ The appellant was afforded all the protection and opportunity created by 21 O.S.1981, § 701.10. The fact that he did not call any witnesses on his own behalf or recall any witnesses from the first stage cannot be attributed to the procedural format of the sentencing stage.[18] The appellant was allowed to argue against imposition of the death penalty in compliance with Section 701.10.

We cannot agree that the appellant was prejudiced or denied any substantive or procedural rights by the manner in which the sentencing was conducted.

Lastly, we consider the sentences assessed by the jury for the appellant's crimes in light of 21 O.S.1981, § 701.13(C).

■ We are convinced that the jury did not impose the appellant's sentences of death under the influence of passion, prejudice or any other arbitrary factor. The record is devoid of prejudicial conduct or remarks which have prompted this Court to modify or reverse death sentences in the past. The appellant received a fair trial in both stages.

■ Secondly, we are convinced the evidence incorporated into the second stage adequately supported the aggravating circumstances found by the jury. The jury found the aggravating circumstances in the murders of Linda and Richard Lorenz to be: 1) that the appellant knowingly created a risk of death to more than one person; 2) that the murders were especially heinous, atrocious or cruel; 3) that the murders were committed for the purpose of avoiding or preventing a lawful arrest or prosecution; and 4) that there existed a probability the appellant would commit criminal acts of violence that would constitute a continuing threat to society. The jury found all the aggravating factors but number three existed in the appellant's murder of Melvin Lorenz.

Immediately after having shot Melvin Lorenz, the appellant opened fire on Linda, and then stalked his third victim, young Richard Lorenz, as he lay crying in the darkness. These facts amply support the aggravating circumstance that the appellant created a risk of death to more than one person. See, *Jones v. State,* 648 P.2d 1251 (Okl.Cr.1982); *Hays v. State,* 617 P.2d 223 (Okl.Cr.1980); *Chaney v. State,* supra.

Likewise, all three murders were especially heinous, atrocious and cruel. The unprovoked murders committed upon a family who had taken time as they made their way to the funeral of a loved one to stop and help a fellow citizen were "extremely wicked," "shockingly evil" and "outrageously wicked and vile." See, *Eddings v. State,* 616 P.2d 1159 (Okl.Cr.1980); *Parks v. State,* supra.

The jury was justified in finding from the evidence adduced at trial that the murders of Linda and Richard Lorenz were committed to avoid or prevent lawful arrest or prosecution. Likewise, the jury was justified in its inference based on the calloused nature of the murders committed by the appellant, that there existed a probability he would commit future acts of violence.

■ Thirdly, we have considered whether the sentence of death is excessive or disproportionate to the penalty imposed in similar cases, considering both the crime and the defendant.[19] We conclude that the

---

18. The appellant has addressed the issue of trial counsel's performance during this stage of the trial in his ineffective assistance of counsel argument. We have considered the matter therein.

19. We have compared this case to other cases under our present murder statute in which the defendants' sentence of death has been affirmed: *Coleman v. State,* 668 P.2d 1126 (Okl. Cr.1983); *Davis v. State,* 665 P.2d 1186 (Okl. Cr.1983); *Stafford v. State,* 665 P.2d 1205 (Okl. Cr.1983); *Smith v. State,* 659 P.2d 330 (Okl.Cr.

1983); *Ake v. State,* 663 P.2d 1 (Okl.Cr.1983); *Parks v. State,* supra; *Jones v. State,* supra; *Hays v. State,* supra; *Eddings v. State,* supra; (Reversed and remanded for resentencing, 102 S.Ct. 869); *Chaney v. State,* supra.

We have also compared this case to other cases under our present murder statute in which the defendants' death sentence has been modified to life: *Jones v. State,* 660 P.2d 634 (Okl.Cr.1983); *Driskell v. State,* 659 P.2d 343 (Okl.Cr.1983); *Boutwell v. State,* 659 P.2d 322 (Okl.Cr.1983); *Munn v. State,* 658 P.2d 482 (Okl.Cr.1983); *Odum v. State,* 651 P.2d 703

penalties of death for each of the members of the Lorenz family are appropriate in this case.

Accordingly, the appellant's convictions of three counts of murder in the first degree and sentence of death for each count are hereby AFFIRMED.

CORNISH and BRETT, JJ., concur.

## APPENDIX A

The trial transcript reads in pertinent part as follows:

THE COURT: Miss Smith, I'll ask you this question:

In a case where the law and the evidence warrant, in a proper case, could you, without doing violence to your conscience, agree to a verdict imposing the death penalty?

MRS. SMITH (Juror) No, sir, I could not.

MRS. HUFF: State would ask that the juror be excused for cause, Your Honor.

MR. BREWER: To which we will object, if the Court please.

THE COURT: I will ask you this question—and take up your matter at a later time, Miss Huff—Miss Smith, if you found beyond a reasonable doubt that the Defendant was guilty of Murder in the First Degree and if under the evidence, facts, and circumstances of the case the law would permit you to consider a sentence of death, are your reservations about the death penalty such that regardless of the law, the facts, and circumstances of the case, you would not inflict the death penalty?

MRS. SMITH: Well, I would do the best I could, but I'm afraid I couldn't.

THE COURT: It's my understanding from the substance of your remark that you could not assess the death penalty regardless of the evidence in the case, is that correct?

MRS. SMITH: Well, I said I would try to do—you know, listen to the evidence to the very best of my ability, but I'm, yes, afraid that I could not be fair in my judgment.

THE COURT: Do you feel like your mind is made up at this time, that you could not assess the death penalty in a proper case?

MRS. SMITH: I'm afraid it is, Your Honor, I'm afraid so.

THE COURT: And regardless of the evidence that was presented and the testimony from the witness stand, regardless of that, you could not assess the death penalty?

MRS. SMITH: I'm afraid I couldn't.

THE COURT: Miss Huff.

MRS. HUFF: Yes, I again appreciate your honesty and would ask that this juror be excused for cause, Your Honor.

MR. BREWER: To which we will object on the grounds of we object to the sole form of the question, on the ground that the Court is trying to impanel a jury to assess the death penalty instead of trial by jury of our peers. If the Court please, we would object strenuously to this.

THE COURT: Miss Smith, are you irrevocably committed to the belief that you could not assess the death penalty regardless of the evidence?

MRS. SMITH: Yes, sir, I am.

THE COURT: You may step down for cause.

## APPENDIX B

MR. BREWER: Now, I have one final motion, if the Court please, at this time which I have served a copy upon the Court for motion for compensation, which

(Okl.Cr.1982); *Burrows v. State,* 640 P.2d 533 (Okl.Cr.1982); *Franks v. State,* 636 P.2d 361 (Okl.Cr.1981); *Irvin v. State,* 617 P.2d 588 (Okl.Cr.1980).

We are convinced that none of the factors which resulted in modification exist here.

We have considered this case in light of the facts of cases in which the defendants' convic-

tions and sentences of death were reversed. *Hall v. State,* 650 P.2d 893 (Okl.Cr.1982); *Brewer v. State,* 650 P.2d 54 (Okl.Cr.1982); *Hager v. State,* 612 P.2d 1369 (Okl.Cr.1980). We find nothing in those cases which would dictate a result different from the one we reach today.

the Court is well-aware of that upon application of the Defendant, the Court declared him indigent, appointed me to represent him as his attorney at law.

Under the provisions of 21 O.S.1978, Section 701.14, provides for this for an amount of up to $2,500. I have attached a time sheet to my application showing the Court that I had 142 hours minimum. That's accountable time already involved in the case, this one particular case. I ask the Court for compensation in the amount of $2,500.

Now, for the Court's own record, there has been a lot of speculation in the news media of statements that I have intentions of profiting, making profit financially from representation of Roger Stafford. At this time I serve notice upon the Court that in the event I should directly receive monetary compensation from the representation of Roger Stafford in the particular case before the Court here, being the Lorenz family case, that I will reimburse the State the full $2,500 plus a reasonable amount of interest that would accrue on that money, if in the event I should make or any of this money comes my way.

There is no—we have no definite plans at this time on anything, but I wanted to assure the Court, and I wanted to assure the Supreme Court and the Legislature and the people that this fund was set up primarily for the purpose that we're using it for.

I do not feel like under these guidelines by the Court that I am obligated in any manner to refund to the State of Oklahoma or to the people any of this $2,500 because the man was indigent at the time. What I do at a later date is my personal business. But for the Court's own feelings and my feelings as well, I assure the Court that I will reimburse the State in the event of what, I said occurs, plus reasonable interest.

Further, I do not mind accounting to the Oklahoma State Bar Association in a memorandum, say, written on a yearly basis advising the Bar Association as to whether or not I have or have not received any compensation in this matter.

I don't want to get it to where I would have to account, say, once a month, which would be very troublesome; but say, once a year I would—I do not mind making financial disclosures to the Bar Association as to any monies received out of this case or any directly relating to this case.

What I am trying to do, if the Court please, is just to assure the Court that the monies are earned in the professional capacity as the Legislature intended; and in the event something should occur, I would be more than grateful to refund the money to the State of Oklahoma.

We don't have any anticipation of that. We don't have any promises of that. We don't—It's not like I'm sitting here knowing there is money coming. We don't know. I anticipate keeping the money, using it in my law practice, and at this time do not have any indications of any other funds whatsoever coming. But I wanted the Court to be aware of that because it had been brought up, and I think it's important that the Court know.

I have also, in this, filed my motion. I have attached for the Court's benefit for their consideration a summary of hours. I did even prepare the standard order that is set forth in Statute. And at this time I am requesting the Court by law and through their appointment to compensate Court-appointed defense counsel in the sum of $2,500.

As the Court's well-aware of the amount of work that's gone into that, $2,500 will not even scratch the surface of the amount of time and effort that has gone into this case.