**Michael Eugene HARMON, Appellant,**

v.

**The STATE of Oklahoma, Appellee.**

**No. F–83–301.**

Court of Criminal Appeals of Oklahoma.

May 8, 1985.

Mark Barrett, Special Counsel, Appellate Public Defender System, Norman, for appellant.

Michael C. Turpen, Atty. Gen., Tomilou Gentry Liddell, Asst. Atty. Gen., Deputy Chief, Crim. Div., Oklahoma City, for appellee.

## OPINION

BRETT, Judge:

Michael Eugene Harmon was convicted of Murder in the First Degree in the District Court of Cleveland County, Case No. CRF–82–248, pursuant to 21 O.S.1981, § 701.7(B). A verdict of life imprisonment [1] was returned by the jury, and judgment and sentence was imposed in accordance with the jury's verdict.

On March 6, 1982, seventeen-year-old Tamara Denise Carter was assaulted at, and abducted from, Sharp's Cleaners in Moore, Oklahoma. Her body was found two days later in a nearby river. An autopsy revealed Miss Carter died from asphyxia (drowning), associated with blunt force head injuries and puncture wounds to the chest.

The State sought to prove appellant was one of three men [2] who robbed the cleaners

---

1. The State sought the death penalty and alleged as aggravating circumstances that (1) the murder was especially heinous, atrocious, or cruel, and (2) the existence of a probability that the defendant would commit criminal acts of violence that would constitute a continuing threat to society. *See* 21 O.S.1981, § 701.12(4), (7). The trial court instructed the jury regarding appellant's age and lack of prior criminal history as minimum mitigating circumstances. The jury made no finding of aggravating circumstances, according to the record.

2. In a separate trial, Bobby Joe Standridge was convicted of murder in the first degree and sentenced to life imprisonment. *See Standridge v. State,* F–83–730. A third trial resulted in the acquittal of Timothy Rist.

and killed Miss Carter. The dispositive issue on this appeal is whether Robert Simmons' post-hypnotic identification of appellant was improper. We hold this evidence was inadmissible and reverse and remand this case for a new trial.

The most damning evidence against Harmon was witness Robert Simmons' identification of the appellant as the man he saw at the cleaners immediately before the robbery-killing. After Simmons first heard about Miss Carter's death, he contacted the Moore Police, to whom he gave a statement. When asked by police whether he could identify the man in the cleaners, however, Simmons replied:

I doubt it. I thought about it coming over now—or now would I recognize him. I really don't think I would. Maybe from a distance. You know, anybody with long hair or black hair with a coat and, you know, I was trying to think whether he had on blue jeans or denims or something. And I don't even remember seeing the shirt. It seemed to me like the coat was unzipped, but I don't remember seeing the shirt or I guess that's the exasperating thing. Well, here I sit and I can't tell you everything I ought to be able to tell you.

The next day, March 9, 1982, Simmons underwent hypnosis at the Moore Police Station in an attempt to refresh his memory. The hypnosis session was not tape recorded.[3] Subsequently the police called Simmons and on March 20, 1982, he viewed three sets of photographs and selected appellant's photograph from the third group. At trial Simmons testified that about 5:00 p.m. on the day of the crime he went to the cleaners where he was waited on by Miss Carter. Simmons observed a man repairing the electrical system in the back of the cleaners but said the lighting was not good, and that he saw the man's profile only. Miss Carter seemed aware of the man's presence. At both preliminary hearing and trial, Simmons identified appellant as the man he saw at the cleaners.

The appellant alleges it was improper to admit Simmons in-court identification, or any testimony relating to post-hypnotic memories. We agree.

■ In *Robison v. State*, 677 P.2d 1080 (Okl.Cr.) *cert. denied,* —— U.S. ——, 104 S.Ct. 3524, 82 L.Ed.2d 831 (1984), this Court held that a witness may not make an in-court identification following hypnosis when no identification has been made prior to the hypnosis. Although the hypnosis does not render a witness incompetent to testify, the witness' testimony is limited to those facts which can demonstrably be shown to have been recalled prior to hypnosis. *Id.* at 1085.

■ Our opinion in *Robison* was based on the conclusion that hypnosis, as a technique of memory retrieval, does not meet the evidentiary standard of "general scientific acceptance." *See Henderson v. State,* 94 Okl.Cr. 45, 230 P.2d 495, *cert. denied,* 342 U.S. 898, 72 S.Ct. 234, 96 L.Ed. 673 (1951) (results of scientific tests will not be admitted without a showing such tests have attained accuracy and general recognition in the scientific community). We have concluded that science has not established hypnosis as a reliable memory-enhancing technique; in fact, the forensic use of hypnosis is frought with danger. *See* Diamond, *Inherent Problems in the Use of Pre-Trial Hypnosis on a Prospective Witness,* 68 CALIF.L.REV. 313 (1980). *See also* Spector & Foster, *Admissibility of Hypnotic Statements: Is the Law of Evidence Susceptible?* 38 OHIO ST.L.J. 567 (1977); Mickenberg, *Mesmerizing Justice: The Use of Hypnotically-Induced Testimony in Criminal Trials,* 34 SYRACUSE L.REV. 927 (1983). Evidence obtained from, or developed by, an unreliable scientific method must be excluded.

Recently, the North Carolina Supreme Court came to the same conclusion. The

---

**3.** Lt. Ray Homer, the hypnotist, testified at preliminary hearing but did not testify at trial. Detective Scott Singer reviewed the tape recording of the interview following the hypnosis session and related what generally transpired.

following discussion of the pitfalls of hypnotically refreshed testimony is excerpted from that Court's opinion in *State v. Peoples*, 311 N.C. 515, 319 S.E.2d 177 (1984):

The basis for the use of hypnotically refreshed testimony hinges on the notion that memory involves the storage of information received by the body's senses in the brain and, therefore, an inability to remember is merely an inability to retrieve previously stored information.... Under this theory, hypnosis operates in a fashion which allows the subject to overcome the difficulties in retrieving this stored information....

Hypnosis, however, involves more than the mere retrieval of stored or suppressed information. What often seems to be recall is in reality a process through which information received after an event is transformed by the subject's mind into a memory of that event.... Essentially the apparent recollection of a hypnotized subject may actually be a view which he has created subconsciously. This composite may evolve from a number of sources, including information gathered from other events, original recall, suggestions occurring during hypnosis from a variety of sources, and the unconscious adding of missing details....

Given this basic description of the theory underlying hypnosis, it is illuminating to examine the specific aspects of hypnotic recall relevant to its use in a judicial proceeding. Such aspects center on the reliability, or potential for accuracy, of recall stimulated by hypnosis.

Scientists generally agree that a number of flaws exist in the hypnotic process which can contribute to inaccurate recollections. These include the subject's eager suggestibility to the hypnotist's words or actions, his desire to accomodate the hypnotist, and his inability to distinguish between actual memory and pseudo memory arising from the hypnosis. Barnard L. Diamond, [a] recognized expert in the area, explains that hypnosis is

a state of increased suggestibility....

[S]uch suggestions cannot be avoided. The suggestive instructions and cues provided to the subject need not be, and often are not, verbal.... Especially powerful as an agent of suggestion is the context and purpose of the hypnotic session. Most hypnotic subjects aim to please....

It is very difficult for human beings to recognize that some of their own thoughts might have been implanted and might not be the product of their own volition.... Normally, mental processes are rationalized and experienced as the product of free will, even when it should be obvious that they are not.

Diamond, "Inherent Problems in the Use of Pretrial Hypnosis on a Prospective Witness," 68 Cal.L.Rev. 313, 333–34 (1980). These considerations operate in tandem with the accepted notion that hypnotized subjects confabulate, *i.e.* invent details to supply unremembered events in order to make their account complete and logical, as well as acceptable to the hypnotist. *Id.* at 342.

The possibility that a person's testimony might be the result of suggestion from another person presents a firm indictment of the reliability of such testimony. The potential for suggestion is exacerbated by the fact that the hypnotic process is directed by a particular individual and the attention of the subject is wholly focused upon that person. Furthermore, suggestions can be entirely unintended and even unperceived by the hypnotist as well as the subject.... Likewise, the subject experiences an overwhelming desire to please the hypnotist and, hence, becomes even more susceptible to suggestion. The subject may unwittingly produce responses which he perceives to be expected. Since a subject under hypnosis undergoes an impaired critical judgment, he may give undue credence to vague and fragmentary memories upon which he would not have relied outside the hypnotic state.... A combination of a susceptibility to suggestion

and a compelling desire to please the hypnotist causes the subject to experience an unwillingness to admit that he cannot recall certain events. Thus he becomes susceptible to creating the event.

If we accept as true the notions of suggestibility and a tendency to confabulate, the dangers surrounding hypnotically refreshed testimony become even more pronounced when we realize that it is virtually impossible for the subject or even the trained, professional hypnotist to distinguish between true memory and pseudo memory.... Both the subject and the hypnotist would tend to accept the accuracy of the post-hypnotic recall. Certainly if neither the subject nor the hypnotist can distinguish between true memory and confabulation, a lay observer, be it judge or juror, could hardly make the distinction. Absent objective, independent means to verify this recall, its accuracy must remain both unknown and unknowable.

In addition to resulting in this inability to distinguish between actual and created memory, the process of hypnosis tends to enhance the subject's confidence in his memory, whether genuine or invented.... After a subject experiences what he believes to be a recall of events under hypnosis, he may develop an unshakable subjective conviction and confidence in his refreshed recollection. One court noted that this problem

> is enhanced by two techniques commonly used by lay hypnotists: Before being hypnotized the subject is told (or believes) that hypnosis will help him to 'remember very clearly everything that happened' in the prior event, and/or during the trance he is given the suggestion that after he awakes he will 'be able to remember' that event equally clearly and comprehensively.

*People v. Shirley,* 31 Cal.3d 18, 65, 641 P.2d 775, 803–04, 181 Cal.Rptr. 243, 272, *cert. denied,* 459 U.S. 860, 103 S.Ct. 133, 74 L.Ed.2d 114 (1982). This difficulty is enhanced after the subject leaves the hypnotic session because he "remembers

the content of his new 'memory' but forgets its source, *i.e.,* forgets that he acquired it during the hypnotic session...." *Id.*

In short, hypnosis not only irrevocably masks whether a subject's recall induced by it is true, it also creates a barrier to the ascertainment of its truthfulness through cross-examination—that method normally relied on in the courtroom to test the truthfulness of testimony.

319 S.E.2d at 180–82.

■ For the foregoing reasons, we reaffirm our holding in *Robison* that testimony relating post-hypnotic memories is inadmissible in this State. We are persuaded that this holding is "prevalent" among American courts. *See* CLEARY, McCORMICK ON EVIDENCE, § 206, p. 633 (3d Ed. 1984).

The State, citing *Robison,* 677 P.2d 1080, and *Stafford v. State,* 669 P.2d 285 (Okl.Cr. 1983), case remanded on other grounds, —— U.S. ——, 104 S.Ct. 2652, 81 L.Ed.2d 359 (1984), has argued that admission of this evidence was harmless because the evidence of appellant's guilt was overwhelming. This contention is meritless.

In *Robison,* the evidence apart from the hypnotized witness was far too overwhelming for this Court to conclude that her identification determined the verdict. *See* 677 P.2d at 1085. In *Stafford,* composite drawings had been made and descriptions given before hypnosis. It was thus readily apparent that the hypnosis did not contribute to the identification of Stafford. 669 P.2d at 294. In addition, the evidence against Stafford was overwhelming. In the case at bar, however, without the testimony of Simmons, the appellant was linked to Miss Carter's death only through inconclusive hair evidence and the testimony of two witnesses who purportedly heard appellant make damaging admissions.

The credibility of the two witnesses who allegedly heard the appellant make incriminating statements was severely impeached. A hair found on the victim's body was microscopically consistent with hair sam-

ples from the appellant. Because the hair found on the victim was less than an inch long, however, the State's expert testified, "I can never say a hair belongs to one person or another specifically. But in this case, I can't even say it could."

Accordingly, we find the appellant was unlawfully prejudiced by this error and cannot say the error was harmless beyond a reasonable doubt. *See Chapman v. California*, 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967). A new trial for this appellant is the only appropriate rememdy. Upon retrial, Simmons may testify only to facts that he related before the hypnotic session.

■ In his dissent Judge Bussey states, "that this matter should be remanded to the trial court for it to make findings of fact concerning the suggestiveness, if any, of the recorded hypnosis procedure and transmit such findings of fact to this Court." As pointed out earlier, the hypnosis session was not recorded. Lt. Ray Homer testified at the preliminary hearing that it was not his method to record a hypnosis session. (Page 95, Preliminary Transcript.) The inquiry after the hypnosis session was recorded, but there is no way to evaluate the hypnosis to determine the question of "suggestiveness". Consequently, it would be an act of futility to remand this matter and a waste of time and money.

The judgment and sentence of the District Court is REVERSED, and the case is REMANDED for a new trial.

PARKS, P.J., concurs.

BUSSEY, J., dissents.

BUSSEY, Judge, dissenting:

On March 6, 1982, Mame Jarvis, who lived across from the appellant in an apartment complex, observed the appellant in another friend's apartment bleeding from a gash over his eye and injury to his ear. She testified that the lacerations appeared to her to be scratch marks and a bite mark. Later the same evening, Ms. Jarvis was awakened by a dog fight outside her apartment and she heard the appellant "talking about taking a girl down to the river and killing her." After Ms. Jarvis heard about the murder of Tamara Carter, she informed the police of the statement, and agreed to try to set up the appellant in order to apprehend him. On the following day, the appellant came to her apartment looking for marijuana, and while talking to Ms. Jarvis, stated, "I could have told them where Bobby was and that we killed her and took her to the river, but I'm not a snitch and I'm not going to rat on them."

Approximately one week before the murder occurred, Randall Dickerson was at Doug Beck's home with the appellant, Bobby Standridge, and Timothy Rist and he overheard them talking about needing money. Mr. Dickerson heard appellant say that it would be easy to "hit" a certain Moore laundromat and that he knew a girl who worked there named Tammy.

I am of the opinion that even if the in-court identification was tainted by impermissibly suggestive hypnosis, the evidence supporting the conviction in the instant case is strong enough that notwithstanding the tainted identification the judgment and sentence should be affirmed. In *Robison v. State*, 677 P.2d 1080 (Okl.Cr.1984), this Court held in pertinent part that:

> The identification was inadmissible and the trial court erred in permitting it to be made. Nevertheless, this error is not grave enough to predicate reversal of the conviction. The evidence apart from Ms. Henderson's identification is far too overwhelming for us to conclude that her identification determined the verdict.

Moreover, even assuming that the evidence was less conclusive, this case should not be reversed on the basis of a per se exclusionary rule of post-hypnotic identification. In *Manson v. Brathwaite*, 432 U.S. 98, 97 S.Ct. 2243, 53 L.Ed.2d 140 (1977), the United States Supreme Court held in substance that the Fourteenth Amendment's guarantee of due process does not require a per se rule of exclusion regarding pretrial identification evidence developed under un-

necessarily suggestive procedures, instead of a rule which permits admission of such evidence if, under the totality of the circumstances, the identification is reliable.

At the very minimum, this Court should remand this matter to the trial court for it to make findings of fact concerning the suggestiveness, if any, of the recorded hypnosis procedure and transmit such findings of fact to this Court.